ESTES *v.* TEXAS.

No. 256.   Argued April 1, 1965.—Decided June 7, 1965.

534

*John D. Cofer* and *Hume Cofer* argued the cause and filed a brief for petitioner.

*Waggoner Carr,* Attorney General of Texas, and *Leon Jaworski,* Special Assistant Attorney General, argued the cause for respondent. With them on the brief were *Hawthorne Phillips, Stanton Stone, Howard M. Fender* and *Gilbert J. Pena,* Assistant Attorneys General, and *Alton F. Curry,* Special Assistant Attorney General.

Briefs of *amici curiae,* urging reversal, were filed by *Whitney North Seymour, Richmond C. Coburn* and *John H. Yauch* for the American Bar Association, and by *Norman Dorsen* and *Melvin L. Wulf* for the American Civil Liberties Union et al.

Briefs of *amici curiae,* urging affirmance, were filed by *Davis Grant* for the State Bar of Texas, joined by *Duke W. Dunbar,* Attorney General of Colorado; and by *Douglas A. Anello, W. Theodore Pierson* and *Harold David Cohen* for the National Association of Broadcasters et al.

MR. JUSTICE CLARK delivered the opinion of the Court.*

The question presented here is whether the petitioner, who stands convicted in the District Court for the Seventh Judicial District of Texas at Tyler for swindling,[1] was

---

*MR. JUSTICE HARLAN concurs in this opinion subject to the reservations and to the extent indicated in his concurring opinion, *post,* p. 587.

[1] The evidence indicated that petitioner, through false pretenses and fraudulent representations, induced certain farmers to purchase fertilizer tanks and accompanying equipment, which in fact did not exist, and to sign and deliver to him chattel mortgages on the fictitious property.

deprived of his right under the Fourteenth Amendment to due process by the televising and broadcasting of his trial. Both the trial court and the Texas Court of Criminal Appeals found against the petitioner. We hold to the contrary and reverse his conviction.

## I.

While petitioner recites his claim in the framework of Canon 35 of the Judicial Canons of the American Bar Association he does not contend that we should enshrine Canon 35 in the Fourteenth Amendment, but only that the time-honored principles of a fair trial were not followed in his case and that he was thus convicted without due process of law. Canon 35, of course, has of itself no binding effect on the courts but merely expresses the view of the Association in opposition to the broadcasting, televising and photographing of court proceedings. Likewise, Judicial Canon 28 of the Integrated State Bar of Texas, 27 Tex. B. J. 102 (1964), which leaves to the trial judge's sound discretion the telecasting and photographing of court proceedings, is of itself not law. In short, the question here is not the validity of either Canon 35 of the American Bar Association or Canon 28 of the State Bar of Texas, but only whether petitioner was tried in a manner which comports with the due process requirement of the Fourteenth Amendment.

Petitioner's case was originally called for trial on September 24, 1962, in Smith County after a change of venue from Reeves County, some 500 miles west. Massive pretrial publicity totaling 11 volumes of press clippings, which are on file with the Clerk, had given it national notoriety. All available seats in the courtroom were taken and some 30 persons stood in the aisles. However, at that time a defense motion to prevent telecasting, broadcasting by radio and news photography and a defense motion for continuance were presented, and after a two-day hearing the former was denied and the latter granted.

These initial hearings were carried live by both radio and television, and news photography was permitted throughout. The videotapes of these hearings clearly illustrate that the picture presented was not one of that judicial serenity and calm to which petitioner was entitled. Cf. *Wood* v. *Georgia,* 370 U. S. 375, 383 (1962); *Turner* v. *Louisiana,* 379 U. S. 466, 472 (1965); *Cox* v. *Louisiana,* 379 U. S. 559, 562 (1965). Indeed, at least 12 cameramen were engaged in the courtroom throughout the hearing taking motion and still pictures and televising the proceedings. Cables and wires were snaked across the courtroom floor, three microphones were on the judge's bench and others were beamed at the jury box and the counsel table. It is conceded that the activities of the television crews and news photographers led to considerable disruption of the hearings. Moreover, veniremen had been summoned and were present in the courtroom during the entire hearing but were later released after petitioner's motion for continuance had been granted. The court also had the names of the witnesses called; some answered but the absence of others led to a continuance of the case until October 22, 1962. It is contended that this two-day pretrial hearing cannot be considered in determining the question before us. We cannot agree. Pretrial can create a major problem for the defendant in a criminal case. Indeed, it may be more harmful than publicity during the trial for it may well set the community opinion as to guilt or innocence. Though the September hearings dealt with motions to prohibit television coverage and to postpone the trial, they are unquestionably relevant to the issue before us. All of this two-day affair was highly publicized and could only have impressed those present, and also the community at large, with the notorious character of the petitioner as well as the proceeding. The trial witnesses present at the hearing, as well as the original jury panel, were un-

doubtedly made aware of the peculiar public importance of the case by the press and television coverage being provided, and by the fact that they themselves were televised live and their pictures rebroadcast on the evening show.

When the case was called for trial on October 22 the scene had been altered. A booth had been constructed at the back of the courtroom which was painted to blend with the permanent structure of the room. It had an aperture to allow the lens of the cameras an unrestricted view of the courtroom. All television cameras and newsreel photographers were restricted to the area of the booth when shooting film or telecasting.

Because of continual objection, the rules governing live telecasting, as well as radio and still photos, were changed as the exigencies of the situation seemed to require. As a result, live telecasting was prohibited during a great portion of the actual trial. Only the opening [2] and closing arguments of the State, the return of the jury's verdict and its receipt by the trial judge were carried live with sound. Although the order allowed videotapes of the entire proceeding without sound, the cameras operated only intermittently, recording various portions of the trial for broadcast on regularly scheduled newscasts later in the day and evening. At the request of the petitioner, the trial judge prohibited coverage of any kind, still or television, of the defense counsel during their summations to the jury.

Because of the varying restrictions placed on sound and live telecasting the telecasts of the trial were confined largely to film clips shown on the stations' regularly scheduled news programs. The news commentators would use the film of a particular part of the day's trial activities as a backdrop for their reports. Their commen-

---

[2] Due to mechanical difficulty there was no picture during the opening argument.

tary included excerpts from testimony and the usual re-
portorial remarks. On one occasion the videotapes of
the September hearings were rebroadcast in place of the
"late movie."

## II.

In *Rideau* v. *Louisiana,* 373 U. S. 723 (1963), this Court
constructed a rule that the televising of a defendant in the
act of confessing to a crime was inherently invalid under
the Due Process Clause of the Fourteenth Amendment
even without a showing of prejudice or a demonstration of
the nexus between the televised confession and the trial.
See *id.,* at 729 (dissenting opinion of CLARK, J.). Here,
although there was nothing so dramatic as a home-viewed
confession, there had been a bombardment of the com-
munity with the sights and sounds of a two-day hearing
during which the original jury panel, the petitioner, the
lawyers and the judge were highly publicized. The peti-
tioner was subjected to characterization and minute elec-
tronic scrutiny to such an extent that at one point the
photographers were found attempting to picture the page
of the paper from which he was reading while sitting at
the counsel table. The two-day hearing and the order
permitting television at the actual trial were widely
known throughout the community. This emphasized the
notorious character that the trial would take and, there-
fore, set it apart in the public mind as an extraordinary
case or, as Shaw would say, something "not conventionally
unconventional." When the new jury was empaneled at
the trial four of the jurors selected had seen and heard
all or part of the broadcasts of the earlier proceedings.

## III.

We start with the proposition that it is a "public trial"
that the Sixth Amendment guarantees to the "accused."
The purpose of the requirement of a public trial was to
guarantee that the accused would be fairly dealt with and

not unjustly condemned. History had proven that secret tribunals were effective instruments of oppression. As our Brother BLACK so well said in *In re Oliver,* 333 U. S. 257 (1948):

"The traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the *lettre de cachet.* . . . Whatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society, the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution." At 268–270. (Footnotes omitted.)

It is said, however, that the freedoms granted in the First Amendment extend a right to the news media to televise from the courtroom, and that to refuse to honor this privilege is to discriminate between the newspapers and television. This is a misconception of the rights of the press.

The free press has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences, including court proceedings. While maximum freedom must be allowed the press in carrying on this important function in a democratic society its exercise must necessarily be subject to the maintenance of absolute fairness in the judicial process. While the state and federal courts have differed over what spectators may be excluded from a criminal trial, 6 Wigmore, Evidence § 1834 (3d ed. 1940), the *amici curiae* brief of the National Association of Broadcasters and the Radio Television News Directors Association, says, as indeed it must, that "neither of these two amendments [First and Sixth] speaks of an unlim-

ited right of access to the courtroom on the part of the broadcasting media . . . ." At 7. Moreover, they recognize that the "primary concern of all must be the proper administration of justice"; that "the life or liberty of any individual in this land should not be put in jeopardy because of actions of any news media"; and that "the due process requirements in both the Fifth and Fourteenth Amendments and the provisions of the Sixth Amendment require a procedure that will assure a fair trial . . . ." At 3–4.

Nor can the courts be said to discriminate where they permit the newspaper reporter access to the courtroom. The television and radio reporter has the same privilege. All are entitled to the same rights as the general public. The news reporter is not permitted to bring his typewriter or printing press. When the advances in these arts permit reporting by printing press or by television without their present hazards to a fair trial we will have another case.

## IV.

Court proceedings are held for the solemn purpose of endeavoring to ascertain the truth which is the *sine qua non* of a fair trial. Over the centuries Anglo-American courts have devised careful safeguards by rule and otherwise to protect and facilitate the performance of this high function. As a result, at this time those safeguards do not permit the televising and photographing of a criminal trial, save in two States and there only under restrictions. The federal courts prohibit it by specific rule. This is weighty evidence that our concepts of a fair trial do not tolerate such an indulgence. We have always held that the atmosphere essential to the preservation of a fair trial—the most fundamental of all freedoms—must be maintained at all costs. Our approach has been through rules, contempt proceedings and reversal of convictions obtained under unfair conditions. Here the remedy is

clear and certain of application and it is our duty to continue to enforce the principles that from time immemorial have proven efficacious and necessary to a fair trial.

## V.

The State contends that the televising of portions of a criminal trial does not constitute a denial of due process. Its position is that because no prejudice has been shown by the petitioner as resulting from the televising, it is permissible; that claims of "distractions" during the trial due to the physical presence of television are wholly unfounded; and that psychological considerations are for psychologists, not courts, because they are purely hypothetical. It argues further that the public has a right to know what goes on in the courts; that the court has no power to "suppress, edit, or censor events which transpire in proceedings before it," citing *Craig* v. *Harney*, 331 U. S. 367, 374 (1947); and that the televising of criminal trials would be enlightening to the public and would promote greater respect for the courts.

At the outset the notion should be dispelled that telecasting is dangerous because it is new. It is true that our empirical knowledge of its full effect on the public, the jury or the participants in a trial, including the judge, witnesses and lawyers, is limited. However, the nub of the question is not its newness but, as MR. JUSTICE DOUGLAS says, "the insidious influences which it puts to work in the administration of justice." Douglas, The Public Trial and the Free Press, 33 Rocky Mt. L. Rev. 1 (1960). These influences will be detailed below, but before turning to them the State's argument that the public has a right to know what goes on in the courtroom should be dealt with.

It is true that the public has the right to be informed as to what occurs in its courts, but reporters of all media, including television, are always present if they wish to be

and are plainly free to report whatever occurs in open court through their respective media. This was settled in *Bridges* v. *California,* 314 U. S. 252 (1941), and *Pennekamp* v. *Florida,* 328 U. S. 331 (1946), which we reaffirm. These reportorial privileges of the press were stated years ago:

> "The law, however, favors publicity in legal proceedings, so far as that object can be attained without injustice to the persons immediately concerned. The public are permitted to attend nearly all judicial inquiries, and there appears to be no sufficient reason why they should not also be allowed to see in print the reports of trials, if they can thus have them presented as fully as they are exhibited in court, or at least all the material portion of the proceedings impartially stated, so that one shall not, by means of them, derive erroneous impressions, which he would not have been likely to receive from hearing the trial itself." 2 Cooley's Constitutional Limitations 931–932 (Carrington ed. 1927).

The State, however, says that the use of television in the instant case was "without injustice to the person immediately concerned," basing its position on the fact that the petitioner has established no isolatable prejudice and that this must be shown in order to invalidate a conviction in these circumstances. The State paints too broadly in this contention, for this Court itself has found instances in which a showing of actual prejudice is not a prerequisite to reversal. This is such a case. It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due

process. Such a case was *In re Murchison,* 349 U. S. 133 (1955), where MR. JUSTICE BLACK for the Court pointed up with his usual clarity and force:

"A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the *probability* of unfairness. . . . [T]o perform its high function in the best way 'justice must satisfy the appearance of justice.' *Offutt* v. *United States,* 348 U. S. 11, 14." At 136. (Emphasis supplied.)

And, as Chief Justice Taft said in *Tumey* v. *Ohio,* 273 U. S. 510, almost 30 years before:

"the requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice. Every procedure which would offer a *possible* temptation to the average man . . . to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." At 532. (Emphasis supplied.)

This rule was followed in *Rideau, supra,* and in *Turner* v. *Louisiana,* 379 U. S. 466 (1965). In each of these cases the Court departed from the approach it charted in *Stroble* v. *California,* 343 U. S. 181 (1952), and in *Irvin* v. *Dowd,* 366 U. S. 717 (1961), where we made a careful examination of the facts in order to determine whether prejudice resulted. In *Rideau* and *Turner* the Court did not stop to consider the actual effect of the practice but struck down the conviction on the ground that prejudice was inherent in it. Likewise in *Gideon* v. *Wainwright,*

372 U. S. 335 (1963), and *White* v. *Maryland,* 373 U. S. 59 (1963), we applied the same rule, although in different contexts.

In this case it is even clearer that such a rule must be applied. In *Rideau, Irvin* and *Stroble,* the pretrial publicity occurred outside the courtroom and could not be effectively curtailed. The only recourse other than reversal was by contempt proceedings. In *Turner* the probability of prejudice was present through the use of deputy sheriffs, who were also witnesses in the case, as shepherds for the jury. No prejudice was shown but the circumstances were held to be inherently suspect, and, therefore, such a showing was not held to be a requisite to reversal. Likewise in this case the application of this principle is especially appropriate. Television in its present state and by its very nature, reaches into a variety of areas in which it may cause prejudice to an accused. Still one cannot put his finger on its specific mischief and prove with particularity wherein he was prejudiced. This was found true in *Murchison, Tumey, Rideau* and *Turner.* Such untoward circumstances as were found in those cases are inherently bad and prejudice to the accused was presumed. Forty-eight of our States and the Federal Rules have deemed the use of television improper in the courtroom. This fact is most telling in buttressing our conclusion that any change in procedure which would permit its use would be inconsistent with our concepts of due process in this field.

## VI.

As has been said, the chief function of our judicial machinery is to ascertain the truth. The use of television, however, cannot be said to contribute materially to this objective. Rather its use amounts to the injection of an irrelevant factor into court proceedings. In addition experience teaches that there are numerous situations

in which it might cause actual unfairness—some so subtle as to defy detection by the accused or control by the judge. We enumerate some in summary:

1. The potential impact of television on the jurors is perhaps of the greatest significance. They are the nerve center of the fact-finding process. It is true that in States like Texas where they are required to be sequestered in trials of this nature the jurors will probably not see any of the proceedings as televised from the courtroom. But the inquiry cannot end there. From the moment the trial judge announces that a case will be televised it becomes a *cause célèbre*. The whole community, including prospective jurors, becomes interested in all the morbid details surrounding it. The approaching trial immediately assumes an important status in the public press and the accused is highly publicized along with the offense with which he is charged. Every juror carries with him into the jury box these solemn facts and thus increases the chance of prejudice that is present in every criminal case. And we must remember that realistically it is only the notorious trial which will be broadcast, because of the necessity for paid sponsorship. The conscious or unconscious effect that this may have on the juror's judgment cannot be evaluated, but experience indicates that it is not only possible but highly probable that it will have a direct bearing on his vote as to guilt or innocence. Where pretrial publicity of all kinds has created intense public feeling which is aggravated by the telecasting or picturing of the trial the televised jurors cannot help but feel the pressures of knowing that friends and neighbors have their eyes upon them. If the community be hostile to an accused a televised juror, realizing that he must return to neighbors who saw the trial themselves, may well be led "not to hold the balance nice, clear and true between the State and the accused . . . ."

Moreover, while it is practically impossible to assess the effect of television on jury attentiveness, those of us who know juries realize the problem of jury "distraction." The State argues this is *de minimis* since the physical disturbances have been eliminated. But we know that distractions are not caused solely by the physical presence of the camera and its telltale red lights. It is the awareness of the fact of telecasting that is felt by the juror throughout the trial. We are all self-conscious and uneasy when being televised. Human nature being what it is, not only will a juror's eyes be fixed on the camera, but also his mind will be preoccupied with the telecasting rather than with the testimony.

Furthermore, in many States the jurors serving in the trial may see the broadcasts of the trial proceedings. Admittedly, the Texas sequestration rule would prevent this occurring there.[3] In other States following no such practice jurors would return home and turn on the TV if only to see how they appeared upon it. They would also be subjected to re-enactment and emphasis of the selected parts of the proceedings which the requirements of the broadcasters determined would be telecast and would be subconsciously influenced the more by that testimony. Moreover, they would be subjected to the broadest commentary and criticism and perhaps the well-meant advice of friends, relatives and inquiring strangers who recognized them on the streets.

Finally, new trials plainly would be jeopardized in that potential jurors will often have seen and heard the original trial when it was telecast. Yet viewers may later

---

[3] Only six States, in addition to Texas, require sequestration of the jury prior to its deliberations in a non-capital felony trial. The great majority of jurisdictions leave the matter to the trial judge's discretion, while in at least one State the jury will be kept together in such circumstances only upon a showing of cause by the defendant.

be called upon to sit in the jury box during the new trial. These very dangers are illustrated in this case where the court, due to the defendant's objections, permitted only the State's opening and closing arguments to be broadcast with sound to the public.

2. The quality of the testimony in criminal trials will often be impaired. The impact upon a witness of the knowledge that he is being viewed by a vast audience is simply incalculable. Some may be demoralized and frightened, some cocky and given to overstatement; memories may falter, as with anyone speaking publicly, and accuracy of statement may be severely undermined. Embarrassment may impede the search for the truth, as may a natural tendency toward overdramatization. Furthermore, inquisitive strangers and "cranks" might approach witnesses on the street with jibes, advice or demands for explanation of testimony. There is little wonder that the defendant cannot "prove" the existence of such factors. Yet we all know from experience that they exist.

In addition the invocation of the rule against witnesses is frustrated. In most instances witnesses would be able to go to their homes and view broadcasts of the day's trial proceedings, notwithstanding the fact that they had been admonished not to do so. They could view and hear the testimony of preceding witnesses, and so shape their own testimony as to make its impact crucial. And even in the absence of sound, the influences of such viewing on the attitude of the witness toward testifying, his frame of mind upon taking the stand or his apprehension of withering cross-examination defy objective assessment. Indeed, the mere fact that the trial is to be televised might render witnesses reluctant to appear and thereby impede the trial as well as the discovery of the truth.

While some of the dangers mentioned above are present as well in newspaper coverage of any important trial, the circumstances and extraneous influences intruding upon the solemn decorum of court procedure in the televised trial are far more serious than in cases involving only newspaper coverage.

3. A major aspect of the problem is the additional responsibilities the presence of television places on the trial judge. His job is to make certain that the accused receives a fair trial. This most difficult task requires his undivided attention. Still when television comes into the courtroom he must also supervise it. In this trial, for example, the judge on several different occasions—aside from the two days of pretrial—was obliged to have a hearing or enter an order made necessary solely because of the presence of television. Thus, where telecasting is restricted as it was here, and as even the State concedes it must be, his task is made much more difficult and exacting. And, as happened here, such rulings may unfortunately militate against the fairness of the trial. In addition, laying physical interruptions aside, there is the ever-present distraction that the mere awareness of television's presence prompts. Judges are human beings also and are subject to the same psychological reactions as laymen. Telecasting is particularly bad where the judge is elected, as is the case in all save a half dozen of our States. The telecasting of a trial becomes a political weapon, which, along with other distractions inherent in broadcasting, diverts his attention from the task at hand—the fair trial of the accused.

But this is not all. There is the initial decision that must be made as to whether the use of television will be permitted. This is perhaps an even more crucial consideration. Our judges are high-minded men and women. But it is difficult to remain oblivious to the pressures that the news media can bring to bear on them both directly

and through the shaping of public opinion. Moreover, where one judge in a district or even in a State permits telecasting, the requirement that the others do the same is almost mandatory. Especially is this true where the judge is selected at the ballot box.

4. Finally, we cannot ignore the impact of courtroom television on the defendant. Its presence is a form of mental—if not physical—harassment, resembling a police line-up or the third degree. The inevitable close-ups of his gestures and expressions during the ordeal of his trial might well transgress his personal sensibilities, his dignity, and his ability to concentrate on the proceedings before him—sometimes the difference between life and death—dispassionately, freely and without the distraction of wide public surveillance. A defendant on trial for a specific crime is entitled to his day in court, not in a stadium, or a city or nationwide arena. The heightened public clamor resulting from radio and television coverage will inevitably result in prejudice. Trial by television is, therefore, foreign to our system. Furthermore, telecasting may also deprive an accused of effective counsel. The distractions, intrusions into confidential attorney-client relationships and the temptation offered by television to play to the public audience might often have a direct effect not only upon the lawyers, but the judge, the jury and the witnesses. See Pye, The Lessons of Dallas— Threats to Fair Trial and Free Press, National Civil Liberties Clearing House, 16th Annual Conference.

The television camera is a powerful weapon. Intentionally or inadvertently it can destroy an accused and his case in the eyes of the public. While our telecasters are honorable men, they too are human. The necessity for sponsorship weighs heavily in favor of the televising of only notorious cases, such as this one, and invariably focuses the lens upon the unpopular or infamous

accused. Such a selection is necessary in order to obtain a sponsor willing to pay a sufficient fee to cover the costs and return a profit. We have already examined the ways in which public sentiment can affect the trial participants. To the extent that television shapes that sentiment, it can strip the accused of a fair trial.

The State would dispose of all these observations with the simple statement that they are for psychologists because they are purely hypothetical. But we cannot afford the luxury of saying that, because these factors are difficult of ascertainment in particular cases, they must be ignored. Nor are they "purely hypothetical." They are no more hypothetical than were the considerations deemed controlling in *Tumey, Murchison, Rideau* and *Turner*. They are real enough to have convinced the Judicial Conference of the United States, this Court and the Congress that television should be barred in federal trials by the Federal Rules of Criminal Procedure; in addition they have persuaded all but two of our States to prohibit television in the courtroom. They are effects that may, and in some combination almost certainly will, exist in any case in which television is injected into the trial process.

## VII.

The facts in this case demonstrate clearly the necessity for the application of the rule announced in *Rideau*. The sole issue before the court for two days of pretrial hearing was the question now before us. The hearing was televised live and repeated on tape in the same evening, reaching approximately 100,000 viewers. In addition, the courtroom was a mass of wires, television cameras, microphones and photographers. The petitioner, the panel of prospective jurors, who were sworn the second day, the witnesses and the lawyers were all exposed to this untoward situation. The judge decided that the trial

proceedings would be telecast. He announced no restrictions at the time. This emphasized the notorious nature of the coming trial, increased the intensity of the publicity on the petitioner and together with the subsequent televising of the trial beginning 30 days later inherently prevented a sober search for the truth. This is underscored by the fact that the selection of the jury took an entire week. As might be expected, a substantial amount of that time was devoted to ascertaining the impact of the pretrial televising on the prospective jurors. As we have noted, four of the jurors selected had seen all or part of those broadcasts. The trial, on the other hand, lasted only three days.

Moreover, the trial judge was himself harassed. After the initial decision to permit telecasting he apparently decided that a booth should be built at the broadcasters' expense to confine its operations; he then decided to limit the parts of the trial that might be televised live; then he decided to film the testimony of the witnesses without sound in an attempt to protect those under the rule; and finally he ordered that defense counsel and their argument not be televised, in the light of their objection. Plagued by his original error—recurring each day of the trial— his day-to-day orders made the trial more confusing to the jury, the participants and to the viewers. Indeed, it resulted in a public presentation of only the State's side of the case.

As Mr. Justice Holmes said in *Patterson* v. *Colorado,* 205 U. S. 454, 462 (1907):

> "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."

It is said that the ever-advancing techniques of public communication and the adjustment of the public to its

presence may bring about a change in the effect of tele-casting upon the fairness of criminal trials. But we are not dealing here with future developments in the field of electronics. Our judgment cannot be rested on the hypothesis of tomorrow but must take the facts as they are presented today.

The judgment is therefore

*Reversed.*

MR. CHIEF JUSTICE WARREN, whom MR. JUSTICE DOUGLAS and MR. JUSTICE GOLDBERG join, concurring.

While I join the Court's opinion and agree that the televising of criminal trials is inherently a denial of due process, I desire to express additional views on why this is so. In doing this, I wish to emphasize that our condemnation of televised criminal trials is not based on generalities or abstract fears. The record in this case presents a vivid illustration of the inherent prejudice of televised criminal trials and supports our conclusion that this is the appropriate time to make a definitive appraisal of television in the courtroom.

I.

Petitioner, a much-publicized financier, was indicted by a Reeves County, Texas, grand jury for obtaining property through false pretenses. The case was transferred to the City of Tyler, in Smith County, Texas, and was set for trial on September 24, 1962. Prior to that date petitioner's counsel informed the trial judge that he would make a motion on September 24 to exclude all cameras from the courtroom during the trial.

On September 24, a hearing was held to consider petitioner's motion to prohibit television, motion pictures, and still photography at the trial. The courtroom was filled with newspaper reporters and cameramen, television cameramen, and spectators. At least 12 cameramen with

their equipment were seen by one observer, and there were 30 or more people standing in the aisles. An article appearing in the New York Times the next day stated:

> "A television motor van, big as an intercontinental bus, was parked outside the courthouse and the second-floor courtroom was a forest of equipment. Two television cameras had been set up inside the bar and four more marked cameras were aligned just outside the gates. . . . [C]ables and wires snaked over the floor." [1]

With photographers roaming at will through the courtroom, petitioner's counsel made his motion that all cameras be excluded. As he spoke, a cameraman wandered behind the judge's bench and snapped his picture. Counsel argued that the presence of cameras would make it difficult for him to consult with his client, make his client ill at ease, and make it impossible to obtain a fair trial since the cameras would distract the jury, witnesses and lawyers. He also expressed the view that televising selected cases tends to give the jury an impression that the particular trial is different from ordinary criminal trials. The court, however, ruled that the taking of pictures and televising would be allowed so long as the cameramen stood outside the railing that separates the trial participants from the spectators. The court also ruled that if a complaint was made that any camera was too noisy, the cameramen would have to stop taking pictures; that no pictures could be taken in the corridors outside the courtroom; and that those with microphones were not to pick up conversations between petitioner and his lawyers. Subsequent to the court's ruling petitioner arrived in the courtroom,[2] and the defense introduced tes-

---

[1] N. Y. Times, Sept. 25, 1962, p. 46, col. 4. See Appendix, Photographs 1, 2, 3.

[2] Counsel explained to the trial court that he desired to protect petitioner from the cameras until the court had made its ruling.

timony concerning the atmosphere in the court on that day. At the conclusion of the day's hearing the judge reasserted his earlier ruling. He then ordered a roll call of the prosecution witnesses, at least some of whom had been in the courtroom during the proceedings.

The entire hearing on September 24 was televised live by station KLTV of Tyler, Texas, and station WFAA–TV of Dallas, Texas. Commercials were inserted when there was a pause in the proceedings. On the evening of Monday, September 24, both stations ran an edited tape of the day's proceedings and interrupted the tape to play the commercials ordinarily seen in the particular time slot. In addition to the live television coverage there was also a live radio pickup of the proceedings by at least one station.

The proceedings continued on September 25. There was again a significant number of cameramen taking motion pictures, still pictures and television pictures. The judge once more ordered cameramen to stay on the other side of the railing and stated that this order was to be observed even during court recesses. The panel from which the petit jury was to be selected was then sworn in the presence of the cameramen. The panel was excused to permit counsel to renew his motion to prohibit photography in the courtroom. The court denied the motion, but granted a continuance of trial until October 22 and dismissed the jury panel. At the suggestion of petitioner's counsel the trial judge warned the prosecution witnesses who were present not to discuss the case during the continuance. The proceedings were televised live and portions of the television tape were shown on the regularly scheduled evening news programs. Live radio transmission apparently occurred as on the day before.

On October 1, 1962, the trial judge issued an order explaining what coverage he would permit during the trial. The judge delivered the order in his chambers for the

benefit of television cameramen so that they could film him.  The judge ruled that although he would permit television cameras to be present during the trial, they would not be permitted to present live coverage of the interrogation of prospective jurors or the testimony of witnesses.  He ruled that each of the three major television networks, NBC, CBS, ABC, and the local television station KLTV could install one camera not equipped to pick up sound and the film would be available to other television stations on a pooled basis.  In addition, he ruled that with respect to news photographers only cameramen for the local press, Associated Press, and United Press would be permitted in the courtroom.  Photographs taken were also to be made available to others on a pooled basis.  The judge did not explain how he decided which television cameramen and which still photographers were to be permitted in the courtroom and which were to be excluded.

For the proceedings beginning on October 22, station KLTV, at its own expense, and with the permission of the court, had constructed a booth in the rear of the courtroom painted the same or near the same color as the courtroom.  An opening running lengthwise across the booth permitted the four television cameras to photograph the proceedings.  The courtroom was small and the cameras were clearly visible to all in the courtroom.[3]  The cameras were equipped with "electronic sound on camera" which permitted them to take both film and sound.  Upon entering the courtroom the judge told all those with television cameras to go back to the booth; asked the press photographers not to move around any more than necessary; ordered that no flashbulbs or floodlights be used; and again told cameramen that they could not go inside the railing.  Defense counsel renewed his motion

---

[3] See Appendix, Photograph 6.

to ban all "sound equipment . . . still cameras, movie cameras and television; and all radio facilities" from the courtroom. Witnesses were again called on this issue, but at the conclusion of the hearing the trial judge reaffirmed his prior ruling to permit cameramen in the courtroom. In response to petitioner's argument that his rights under the Constitution of the United States were being violated, the judge remarked that the "case [was] not being tried under the Federal Constitution."

None of the proceedings on October 22 was televised live. Television cameras, however, recorded the day's entire proceedings with sound for later showings. Apparently none of the October 22 proceedings was carried live on radio, although the proceedings were recorded on tape. The still photographers admitted by the court were free to take photographs from outside the railing.

On October 23 the selection of the jury began. Overnight an additional strip had been placed across the television booth so that the opening for the television cameras was reduced, but the cameras and their operators were still quite visible.[4] A panel of 86 prospective jurors was ready for the *voir dire*. The judge excused the jurors from the courtroom and made still another ruling on news coverage at the trial. He ordered the television recording to proceed from that point on without an audio pickup, and, in addition, forbade radio tapes of any further proceedings until all the evidence had been introduced. During the course of the trial the television cameras recorded without sound whatever matters appeared interesting to them for use on later newscasts; radio broadcasts in the form of spot reports were made from a room next to the courtroom. There was no live television or radio coverage until November 7 when the trial judge permitted live coverage of the prosecution's

---

[4] See Appendix, Photograph 7.

arguments to the jury, the return of the jury's verdict and its acceptance by the court. Since the defense objected to being photographed during the summation, the judge prohibited television cameramen or still photographers from taking any pictures of the defense during its argument. But the show went on, and while the defense was speaking the cameras were directed at the judge and the arguments were monitored by audio equipment and relayed to the television audience by an announcer. On November 7 the judge, for the first time, directed news photographers desiring to take pictures to take them only from the back of the room. Up until this time the trial judge's orders merely limited news photographers to the spectator section.

## II.

The decision below affirming petitioner's conviction runs counter to the evolution of Anglo-American criminal procedure over a period of centuries. During that time the criminal trial has developed from a ritual practically devoid of rational justification [5] to a fact-finding process, the acknowledged purpose of which is to provide a fair and reliable determination of guilt.[6]

An element of rationality was introduced into the guilt-determining process in England over 600 years ago when a rudimentary trial by jury became "the principal institution for criminal cases." [7] Initially members of the jury were expected to make their own examinations of the cases they were to try and come to court already familiar

---

[5] Jenks, A Short History of English Law 46–47 (6th ed. 1949); I Stephen, A History of the Criminal Law of England 51–74 (1883).

[6] See, e. g., Craig v. Harney, 331 U. S. 367, 378; Irvin v. Dowd, 366 U. S. 717, 728; Brady v. Maryland, 373 U. S. 83, 87; Jackson v. Denno, 378 U. S. 368, 391.

[7] See Singer v. United States, 380 U. S. 24, 27.

with the facts,[8] which made it impossible to limit the jury's determination to legally relevant evidence. Gradually, however, the jury was transformed from a panel of witnesses to a panel of triers passing on evidence given by others in the courtroom.[9] The next step was to insure the independence of the jury, and this was accomplished by the decision in the case of *Edward Bushell*, 6 How.. St. Tr. 999 (1670), which put an end to the practice of fining or otherwise punishing jury members who failed to reach the decision directed by the court. As the purpose of trial as a vehicle for discovering the truth became clearer, it was recognized that the defendant should have the right to call witnesses and to place them under oath,[10] to be informed of the charges against him before the trial,[11] and to have counsel assist him with his defense.[12] All these protections, and others which could be cited, were part of a development by which "the administration of criminal justice was set upon a firm and dignified basis." [13]

When the colonists undertook the responsibility of governing themselves, one of their prime concerns was the establishment of trial procedures which would be consistent with the purpose of trial. The Continental Congress passed measures designed to safeguard the right to a fair trial,[14] and the various States adopted constitutional pro-

---

[8] II Pollock and Maitland, The History of English Law 621–622 (2d ed. 1909).

[9] I Stephen, *supra,* note 5, at 260.

[10] See 7 Will. 3, c. 3 (1695).

[11] *Ibid.*

[12] *Ibid.;* 6 & 7 Will. 4, c. 114 (1836).

[13] I Stephen, *supra,* note 5, at 427.

[14] I Journals of the Continental Congress 1774–1789, 69 (Ford ed. 1904).

visions directed to the same end.[15]   Eventually the Sixth Amendment incorporated into the Constitution certain provisions dealing with the conduct of trials:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

Significantly, in the Sixth Amendment the words "speedy and public" qualify the term *trial* and the rest of the Amendment defines specific protections the accused is to have at his *trial*.   Thus, the Sixth Amendment, by its own terms, not only requires that the accused have certain specific rights but also that he enjoy them at a *trial*— a word with a meaning of its own, see *Bridges* v. *California*, 314 U. S. 252, 271.

The Fourteenth Amendment which places limitations on the States' administration of their criminal laws also gives content to the term *trial*.   Whether the Sixth Amendment as a whole applies to the States through the Fourteenth,[16] or the Fourteenth Amendment embraces only those portions of the Sixth Amendment that are "fundamental," [17] or the Fourteenth Amendment incorporates a standard of "ordered liberty" apart from the

---

[15] Radin, The Right to a Public Trial, 6 Temple L. Q. 381, 383, n. 5a (1932).

[16] *Adamson* v. *California*, 332 U. S. 46, 71–72 (dissenting opinion of MR. JUSTICE BLACK).

[17] *Gideon* v. *Wainwright*, 372 U. S. 335, 342.

specific guarantees of the Bill of Rights,[18] it has been recognized that state prosecutions must, at the least, comport with "the fundamental conception" of a fair trial.[19]

It has been held on one or another of these theories that the fundamental conception of a fair trial includes many of the specific provisions of the Sixth Amendment, such as the right to have the proceedings open to the public, *In re Oliver*, 333 U. S. 257; the right to notice of specific charges, *Cole* v. *Arkansas*, 333 U. S. 196; the right to confrontation, *Pointer* v. *Texas*, 380 U. S. 400; *Douglas* v. *Alabama*, 380 U. S. 415; and the right to counsel, *Gideon* v. *Wainwright*, 372 U. S. 335. But it also has been agreed that neither the Sixth nor the Fourteenth Amendment is to be read formalistically, for the clear intent of the amendments is that these specific rights be enjoyed at a constitutional trial. In the words of Justice Holmes, even though "every form [be] preserved," the forms may amount to no "more than an empty shell" when considered in the context or setting in which they were actually applied.[20]

In cases arising from state prosecutions this Court has acted to prevent the right to a constitutional trial from being reduced to a formality by the intrusion of factors into the trial process that tend to subvert its purpose. The Court recognized in *Pennekamp* v. *Florida*, 328 U. S.

---

[18] *Pointer* v. *Texas*, 380 U. S. 400, 408 (opinion of Mr. Justice Harlan, concurring in the result).

[19] *Cox* v. *Louisiana*, 379 U. S. 559, 562; *Frank* v. *Mangum*, 237 U. S. 309, 347 (dissenting opinion of Justice Holmes). See *Adamson* v. *California*, 332 U. S. 46, 53; *In re Murchison*, 349 U. S. 133, 136; *Irvin* v. *Dowd*, 366 U. S. 717, 722; *Jackson* v. *Denno*, 378 U. S. 368, 377 (Court opinion), 424 (dissenting opinion of Mr. Justice Clark), 428 (dissenting opinion of Mr. Justice Harlan).

[20] *Frank* v. *Mangum*, 237 U. S. 309, 346 (dissenting opinion).

331, 334, that the "orderly operation of courts" is "the primary and dominant requirement in the administration of justice." And, in *Moore* v. *Dempsey,* 261 U. S. 86, 90–91, it was held that the atmosphere in and around the courtroom might be so hostile as to interfere with the trial process, even though an examination of the record disclosed that all the forms of trial conformed to the requirements of law: the defendant had counsel, the jury members stated they were impartial, the jury was correctly charged, and the evidence was legally sufficient to convict. Moreover, in *Irvin* v. *Dowd,* 366 U. S. 717, a conviction was reversed where extensive pretrial publicity rendered a fair trial unlikely despite the observance of the formal requisites of a legal trial. We commented in that case:

> "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father." *Id.,* at 728.

To recognize that disorder can convert a trial into a ritual without meaning is not to pay homage to order as an end in itself. Rather, it recognizes that the courtroom in Anglo-American jurisprudence is more than a location with seats for a judge, jury, witnesses, defendant, prosecutor, defense counsel and public observers; the setting that the courtroom provides is itself an important element in the constitutional conception of trial, contributing a dignity essential to "the integrity of the trial" process. *Craig* v. *Harney,* 331 U. S. 367, 377. As MR. JUSTICE BLACK said, in another context: "The very purpose of a court system is to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures." [21] In light of this fundamental conception of what the term *trial*

---

[21] *Cox* v. *Louisiana,* 379 U. S. 559, 583 (dissenting opinion).

means, this Court has recognized that often, despite widespread, hostile publicity about a case, it.is possible to conduct a trial meeting constitutional standards. Significantly, in each of these cases, the basic premise behind the Court's conclusion has been the notion that judicial proceedings can be conducted with dignity and integrity so as to shield the trial process itself from these irrelevant, external factors, rather than to aggravate them as here. Thus, in reversing contempt convictions for out-of-court statements, this Court referred to "the power of courts to protect themselves from disturbances and disorder *in the court room," Bridges* v. *California,* 314 U. S. 252, 266 (emphasis added); "the necessity for fair adjudication, free from interruption of its processes," *Pennekamp* v. *Florida,* 328 U. S. 331, 336; "the integrity of the trial," *Craig* v. *Harney,* 331 U. S. 367, 377. And, in upholding a conviction against a claim of unfavorable publicity, this Court commented "that petitioner's trial was conducted in a calm judicial manner," *Darcy* v. *Handy,* 351 U. S. 454, 463.

Similarly, when state procedures have been found to thwart the purpose of trial this Court has declared those procedures to be unconstitutional. In *Tumey* v. *Ohio,* 273 U. S. 510, the Court considered a state procedure under which judges were paid for presiding over a case only if the defendant was found guilty and costs assessed against him. An argument was made that the practice should not be condemned broadly, since some judges undoubtedly would not let their judgment be affected by such an arrangement. However, the Court found the procedure so inconsistent with the conception of what a trial should be and so likely to produce prejudice that it declared the practice unconstitutional even though no specific prejudice was shown.

In *Lyons* v. *Oklahoma,* 322 U. S. 596, this Court stated that if an involuntary confession is introduced into evi-

dence at a state trial the conviction must be reversed, even though there is other evidence in the record to justify a verdict of guilty. We explained the rationale behind this judgment in *Payne* v. *Arkansas,* 356 U. S. 560, 568:

> "[W]here . . . a coerced confession constitutes a part of the evidence before the jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession."

Similar reasoning led to the decision last Term in *Jackson* v. *Denno,* 378 U. S. 368. We held there that when the voluntariness of a confession is at issue there must be a procedure adopted which provides "a reliable and clear-cut determination of . . . voluntariness." *Id.,* at 391. We found insufficient a procedure whereby the jury heard the confession but was instructed to disregard it if the jury found the confession involuntary:

> "[T]he New York procedure poses substantial threats to a defendant's constitutional rights to have an involuntary confession entirely disregarded and to have the coercion issue fairly and reliably determined. These hazards we cannot ignore." *Id.,* at 389.

Earlier this Term, in *Turner* v. *Louisiana,* 379 U. S. 466, we considered a case in which deputy sheriffs, who were the prosecution's principal witnesses, were in charge of a sequestered jury during the trial. The Supreme Court of Louisiana criticized the practice but said that in the absence of a showing of prejudice there was no ground for reversal. We reversed because the "extreme prejudice inherent" in the practice required its condemnation on constitutional grounds.

Finally, the Court has on numerous other occasions reversed convictions, where the formalities of trial were

observed, because of practices that negate the fundamental conception of trial.[22]

This line of cases does not indicate a disregard for the position of the States in our federal system. Rather, it stands for the proposition that the criminal trial under our Constitution has a clearly defined purpose, to provide a fair and reliable determination of guilt, and no procedure or occurrence which seriously threatens to divert it from that purpose can be tolerated.

## III.

For the Constitution to have vitality, this Court must be able to apply its principles to situations that may not have been foreseen at the time those principles were adopted. As was said in *Weems* v. *United States*, 217 U. S. 349, 373, and reaffirmed in *Brown* v. *Board of Education*, 347 U. S. 483, 492–493:

> "Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils, but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. . . . In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by prece-

---

[22] See *Mooney* v. *Holohan*, 294 U. S. 103; *Alcorta* v. *Texas*, 355 U. S. 28; *Napue* v. *Illinois*, 360 U. S. 264; and *Brady* v. *Maryland*, 373 U. S. 83.

dent into impotent and lifeless formulas. Rights declared in words might be lost in reality."

I believe that it violates the Sixth Amendment for federal courts and the Fourteenth Amendment for state courts to allow criminal trials to be televised to the public at large. I base this conclusion on three grounds: (1) that the televising of trials diverts the trial from its proper purpose in that it has an inevitable impact on all the trial participants; (2) that it gives the public the wrong impression about the purpose of trials, thereby detracting from the dignity of court proceedings and lessening the reliability of trials; and (3) that it singles out certain defendants and subjects them to trials under prejudicial conditions not experienced by others.

I have attempted to show that our common-law heritage, our Constitution, and our experience in applying that Constitution have committed us irrevocably to the position that the criminal trial has one well-defined purpose—to provide a fair and reliable determination of guilt. In *Tumey* v. *Ohio, supra,* at 532, this Court condemned the procedure there employed for compensating judges because it offered a "possible temptation" to judges "not to hold the balance nice, clear and true between the State and the accused." How much more harmful is a procedure which not only offers the temptation to judges to use the bench as a vehicle for their own ends, but offers the same temptation to every participant in the trial, be he defense counsel, prosecutor, witness or juror! It is not necessary to speak in the abstract on this point. In the present case, on October 1, the trial judge invited the television cameras into his chambers so they could take films of him reading one of his pretrial orders. On this occasion, at least, the trial judge clearly took the initiative in placing himself before the television audience and in giving his order, and himself, the maximum possible publicity. Moreover, on October 22, when trial counsel re-

newed his motion to exclude television from the courtroom on the ground that it violated petitioner's rights under the Federal Constitution, the trial judge made the following speech:

"This case is not being tried under the Federal Constitution. This Defendant has been brought into this Court under the state laws, under the State Constitution.

. . . . .

"I took an oath to uphold this Constitution; not the Federal Constitution but the State Constitution; and I am going to do my best to do that as long as I preside on this Court, and if it is distasteful in following my oath and upholding the constitution, it will just have to be distasteful."

One is entitled to wonder if such a statement would be made in a court of justice by any state trial judge except as an appeal calculated to gain the favor of his viewing audience. I find it difficult to believe that this trial judge, with over 20 years' experience on the bench, was unfamiliar with the fundamental duty imposed on him by Article VI of the Constitution of the United States:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

This is not to say that all participants in the trial would distort it by deliberately playing to the television audience, but some undoubtedly would. The even more serious danger is that neither the judge, prosecutor, defense counsel, jurors or witnesses would be able to go

through trial without considering the effect of their conduct on the viewing public. It is admitted in dissent that "if the scene at the September hearing had been repeated in the courtroom during this jury trial, it is difficult to conceive how a fair trial in the constitutional sense could have been afforded the defendant." *Post,* p. 612. But it is contended that what went on at the September hearing is irrelevant to the issue before us. With this I cannot agree. We granted certiorari to consider whether petitioner was denied due process when he was required to submit to a televised trial. In this, as in other cases involving rights under the Due Process Clause, we have an obligation to make an independent examination of the record, *e. g., Watts* v. *Indiana,* 338 U. S. 49, 51; *Norris* v. *Alabama,* 294 U. S. 587, 590; and the limited grant of certiorari does not prohibit us from considering all the facts in this record relevant to the question before us. The parties to this case, and those who filed briefs as *amici curiae,* recognize this, since they treat the televising of the September proceedings as a factor relevant to our consideration. Our decisions in *White* v. *Maryland,* 373 U. S. 59, and *Hamilton* v. *Alabama,* 368 U. S. 52, clearly hold that an accused is entitled to procedural protections at pretrial hearings as well as at actual trial and his conviction will be reversed if he is not accorded these protections. In addition, in *Pointer* v. *Texas,* 380 U. S. 400, we held that a pretrial hearing can have a profound effect on the trial itself and effectively prevent an accused from having a fair trial. Petitioner clearly did not have a fair determination of his motion to exclude cameras from the courtroom. The very presence of the cameras at the September hearing tended to impress upon the trial judge the power of the communications media and the criticism to which he would have been subjected if he had ruled that the presence of the cameras was inconsistent with petitioner's right to a fair trial. The prejudice to peti-

tioner did not end here. Most of the trial participants were present at the September hearing—the judge, defense counsel, prosecutor, prosecution witnesses and defendant himself—and they saw for themselves the desecration of the courtroom. After undergoing this experience it is unrealistic to suppose that they would come to the October trial unaware that court procedures were being sacrificed in this case for the convenience of television. The manner in which the October proceedings were conducted only intensified this awareness. It was impossible for any of the trial participants ever to be unaware of the presence of television cameras in court for the actual trial.[23] The snouts of the four television cameras protruded through the opening in the booth, and the cameras and their operators were not only readily visible but were impossible to ignore by all who were surveying the activities in this small courtroom. No one could forget that he was constantly in the focus of the "all-seeing eye." Although the law of Texas purportedly permits witnesses to object to being televised, it is ludicrous to place this burden on them. They would naturally accept the conditions of the courtroom as the judge establishes them, and feel that it would be as presumptuous for them to object to the court's permitting television as to object to the court reporter's recording their testimony. Yet, it is argued that no witnesses objected to being televised. This is indeed a slender reed to rely on, particularly in view of the trial judge's failure, in the course of his self-exculpating statements justifying his decision to allow television, to advise the witnesses or the jurors that they had the right to object to being televised. Defense counsel, however, stated forcefully that he could not concentrate on the case because of the distraction caused by the cameras. And the trial judge's atten-

---

[23] See Appendix, Photograph 7.

tion was distracted from the trial since he was compelled
to make seven extensive rulings concerning television cov-
erage during the October proceedings alone, when he
should, instead, have been concentrating on the trial itself.

It is common knowledge that "television . . . can . . .
work profound changes in the behavior of the people
it focuses on." [24]   The present record provides ample sup-
port for scholars who have claimed that awareness that a
trial is being televised to a vast, but unseen audience, is
bound to increase nervousness and tension,[25] cause an in-

---

[24] Keating, "Not 'Bonanza,' Not 'Peyton Place,' But the U. S. Sen-
ate," N. Y. Times Magazine, April 25, 1965, 67, 72.  See, e. g., N. Y.
Times, April 22, 1965, p. 43, col. 2 (in describing a televised stock-
holders' meeting the Times reported, "Some stockholders seemed
very much aware they were on camera"); Tinkham, Should Canon
35 Be Amended? A Question of Proper Judicial Administration,
42 A. B. A. J. 843, 845 (1956) (in giving examples of how people
react when they know they are on television, the author describes
the reactions of a television audience when the camera was turned ·
on it as "contorted, grimacing"); Gould, N. Y. Times, March 11,
1956, § 2, p. X 11, col. 2 ("The most experienced performers in show
business know the horrors of stage fright before they go on TV.  This
psychological and emotional burden must not be placed on a layman
whose testimony may have a bearing on whether, in a murder trial,
another human being is to live or die.").

[25] See, e. g., Douglas, The Public Trial and the Free Press, 46 A. B.
A. J. 840, 842 (1960).  In United States v. Kleinman, 107 F. Supp.
407 (D. C. D. C. 1952), the court refused to hold in contempt wit-
nesses in a congressional hearing who refused to answer questions
while television cameras were focused on them.  The court stated:

"The only reason for having a witness on the stand, either before
a committee of Congress or before a court, is to get a thoughtful,
calm, considered and, it is to be hoped, truthful disclosure of facts.
That is not always accomplished, even under the best of circumstances.
But at least the atmosphere of the forum should lend itself to that
end.

"In the cases now to be decided, the stipulation of facts discloses
that there were, in close proximity to the witness, television cam-
eras, newsreel cameras, news photographers with their concomitant
flashbulbs, radio microphones, a large and crowded hearing room with

creased concern about appearances,[26] and bring to the surface latent opportunism that the traditional dignity of the courtroom would discourage. Whether they do so consciously or subconsciously, all trial participants act differently in the presence of television cameras. And, even if all participants make a conscientious and studied effort to be unaffected by the presence of television, this effort in itself prevents them from giving their full attention to their proper functions at trial. Thus, the evil of televised trials, as demonstrated by this case, lies not in the noise and appearance of the cameras, but in the trial participants' awareness that they are being televised. To the extent that television has such an inevitable impact it undercuts the reliability of the trial process.

In the early days of this country's development, the entertainment a trial might provide often tended to obfuscate its proper role.

> "The people thought holding court one of the greatest performances in the range of their experience. . . . The country folks would crowd in for ten miles to hear these 'great lawyers' plead; and it was a secondary matter with the client whether he won or lost his case, so the 'pleading' was loud and long." [27]

> "In early frontier America, when no motion pictures, no television, and no radio provided entertain-

---

spectators standing along the walls, etc. The obdurate stand taken by these two defendants must be viewed in the context of all these conditions. The concentration of all of these elements seems to me necessarily so to disturb and distract any witness to the point that he might say today something that next week he will realize was erroneous. And the mistake could get him in trouble all over again." *Id.*, at 408.

[26] See, *e. g.*, Douglas, *supra*, note 25, at 842; Yesawich, Televising and Broadcasting Trials, 37 Cornell L. Q. 701, 717 (1952).

[27] Wigmore, A Kaleidoscope of Justice 487 (1941).

ment, trial day in the county was like fair day, and from near and far citizens young and old converged on the county seat. The criminal trial was the theater and *spectaculum* of old rural America. Applause and cat calls were not infrequent. All too easily lawyers and judges became part-time actors at the bar . . . ." [28]

I had thought that these days of frontier justice were long behind us, but the courts below would return the theater to the courtroom.

The televising of trials would cause the public to equate the trial process with the forms of entertainment regularly seen on television and with the commercial objectives of the television industry. In the present case, tapes of the September 24 hearing were run in place of the "Tonight Show" by one station and in place of the late night movie by another. Commercials for soft drinks, soups, eyedrops and seatcovers were inserted when there was a pause in the proceedings. In addition, if trials were televised there would be a natural tendency on the part of broadcasters to develop the personalities of the trial participants, so as to give the proceedings more of an element of drama. This tendency was noticeable in the present case. Television commentators gave the viewing audience a homey, flattering sketch about the trial judge, obviously to add an extra element of viewer appeal to the trial:

"Tomorrow morning at 9:55 the WFAA T. V. cameras will be in Tyler to telecast live [the trial judge's] decision whether or not he will permit live coverage of the Billie Sol Estes trial. If so, this will be the first such famous national criminal proceeding to be televised in its entirety live. [The trial judge]

[28] Mueller, Problems Posed by Publicity to Crime and Criminal Proceedings, 110 U. Pa. L. Rev. 1, 6 (1961).

was appointed to the bench here in Tyler in 1942 by [the Governor]. The judge has served every two years since then. This *very* beautiful Smith County Courthouse was built and dedicated in 1954, but before that [the trial judge] had made a reputation for himself that reached not only throughout Texas, but throughout the United States as well. It is said that [the trial judge], who is now 53 years old, has tried more cases than any other judge during his time in office."

The television industry might also decide that the bare-boned trial itself does not contain sufficient drama to sustain an audience. It might provide expert commentary on the proceedings and hire persons with legal backgrounds to anticipate possible trial strategy, as the football expert anticipates plays for his audience. The trial judge himself stated at the September hearing that if he wanted to see a ball game he would turn on his television set, so why not the same for a trial.

Moreover, should television become an accepted part of the courtroom, greater sacrifices would be made for the benefit of broadcasters. In the present case construction of a television booth in the courtroom made it necessary to alter the physical layout of the courtroom and to move from their accustomed position two benches reserved for spectators.[29] If this can be done in order better to accommodate the television industry, I see no reason why another court might not move a trial to a theater, if such a move would provide improved television coverage. Our memories are short indeed if we have already forgotten the wave of horror that swept over this country when Premier Fidel Castro conducted his prosecutions before 18,000 people in Havana Stadium.[30] But in the decision

---

[29] Compare Appendix, Photograph 5, with Appendix, Photograph 6.
[30] N. Y. Times, Jan. 23, 1959, p. 1, col. 1.

below, which completely ignores the importance of the courtroom in the trial process, we have the beginnings of a similar approach toward criminal "justice." This is not an abstract fear I am expressing because this very situation confronted the Nebraska Supreme Court in *Roberts* v. *State,* 100 Neb. 199, 203, 158 N. W. 930, 931– 932 (1916):

> "The court removed the trial from the court-room to the theater, and stated as a reason therefor: 'By reason of the insufficiency of the court-room to seat and accommodate the people applying for admission . . . it is by the court ordered that the further trial of this cause be had at the Keith Theater, and thereupon the court was adjourned to Keith Theater, where trial proceeded.' The stage was occupied by court, counsel, jury, witnesses, and officers connected with the trial. The theater proper was crowded with curious spectators. Before the trial was completed it was returned to the court-room and concluded there. At the adjournment of court on one occasion the bailiff announced from the stage: 'The regular show will be tomorrow; matinee in the afternoon and another performance at 8:30. Court is now adjourned until 7:30.'"

There would be a real threat to the integrity of the trial process if the television industry and trial judges were allowed to become partners in the staging of criminal proceedings. The trial judge in the case before us had several "conferences [with] representatives of the news media." *Post,* p. 606. He then entered into a joint enterprise with a television station for the construction of a booth in his courtroom. The next logical step in this partnership might be to schedule the trial for a time that would permit the maximum number of viewers to watch and to schedule recesses to coincide with the need for station breaks. Should the television industry become an

integral part of our system of criminal justice, it would not be unnatural for the public to attribute the short-comings of the industry to the trial process itself. The public is aware of the television industry's consuming interest in ratings, and it is also aware of the steps that have been taken in the past to maintain viewer interest in television programs. Memories still recall vividly the scandal caused by the disclosure that quiz programs had been corrupted in order to heighten their dramatic appeal. Can we be sure that similar efforts would not be made to heighten the dramatic appeal of televised trials? Can we be sure that the public would not inherently distrust our system of justice because of its intimate association with a commercial enterprise?

Broadcasting in the courtroom would give the television industry an awesome power to condition the public mind either for or against an accused. By showing only those parts of its films or tapes which depict the defendant or his witnesses in an awkward or unattractive position, television directors could give the community, state or country a false and unfavorable impression of the man on trial. Moreover, if the case should end in a mistrial, the showing of selected portions of the trial, or even of the whole trial, would make it almost impossible to select an impartial jury for a second trial. Cf. *Rideau* v. *Louisiana,* 373 U. S. 723. To permit this powerful medium to use the trial process itself to influence the opinions of vast numbers of people, before a verdict of guilt or innocence has been rendered, would be entirely foreign to our system of justice.

The sense of fairness, dignity and integrity that all associate with the courtroom would become lost with its commercialization. Thus, the televising of trials would not only have an effect on those participating in the trials that are being televised, but also on those who observe the trials and later become trial participants.

It is argued that television not only entertains but also educates the public. But the function of a trial is not to provide an educational experience; and there is a serious danger that any attempt to use a trial as an educational tool will both divert it from its proper purpose and lead to suspicions concerning the integrity of the trial process. The Soviet Union's trial of Francis Gary Powers provides an example in point. The integrity of the trial was suspect because it was concerned not only with determining the guilt of the individual on trial but also with providing an object lesson to the public. This divided effort undercut confidence in the guilt-determining aspect of the procedure and by so doing rendered the educational aspect self-defeating.

"Was it prejudicial to [Powers] that the trial took place in a special hall with over 2,000 spectators, that it was televised, that prominent representatives of many organizations in various countries were invited to attend, that simultaneous oral translations of the proceedings . . . were provided, and that detailed . . . reports of the case in various languages were distributed to the press before, during and after the trial?"

". . . [T]he Soviet legal system . . . consciously and explicitly uses the trial, and indeed the very safeguards of justice themselves, as instruments of the social and political objectives of the state. . . .

". . . A Soviet trial is supposed to be correct, impartial, just, reasonable, and at the same time it is supposed to serve as an object-lesson to society, a means of teaching the participants, the spectators and the public generally to be loyal, obedient, disciplined fighters for Communist ideals. . . .

". . . [T]he tension between the demands of justice and the demands of politics can never be entirely

eliminated. The fate of the accused is bound to be influenced in one way or another when the trial is lifted above its individual facts and deliberately made an object-lesson to the public."

". . . [T]he deliberate use of a trial as a means of political education threatens the integrity of the judicial process." [31]

Finally, if the televising of criminal proceedings were approved, trials would be selected for television coverage for reasons having nothing to do with the purpose of trial. A trial might be televised because a particular judge has gained the fancy of the public by his unorthodox approach; or because the district attorney has decided to run for another office and it is believed his appearance would attract a large audience; or simply because a particular courtroom has a layout that best accommodates television coverage.[32] For the most part, however, the most important factor that would draw television to the courtroom would be the nature of the case. The alleged perpetrator of the sensational murder, the fallen idol, or some other person who, like petitioner, has attracted the public interest would find his trial turned into

---

[31] Berman, Introduction to the Trial of the U 2 xiii, xii–xiii, xxix (1960).

[32] A revealing dialogue took place in the present case between defense counsel and one of the television executives present in the courtroom during the September 24 hearing.

"Q. The camera on the other side of the room has to look over a corner of the jury box and past the jurors to be aimed at the witness box, does it not?

"A. I think that is pretty clear, sir. I don't think the jurors would be in the way there.

"Q. You don't think the jurors would get in the way of your operations?

"A. I don't mean that exactly, sir."

a vehicle for television. Yet, these are the very persons who encounter the greatest difficulty in securing an impartial trial, even without the presence of television. This Court would no longer be able to point to the dignity and calmness of the courtroom as a protection from outside influences. For the television camera penetrates this protection and brings into the courtroom tangible evidence of the widespread interest in a case—an interest which has often been fanned by exhaustive reports in the newspapers, television and radio for weeks before trial. The present case presents a clear example of this danger. In the words of petitioner's counsel:

> "The Saturday Evening Post, The Readers Digest, Time, Life all had feature stories upon [petitioner's] story giving in detail his life history and the details of . . . alleged fraudulent transactions . . . .
> "The metropolitan papers throughout the country featured the story daily. Each day for weeks the broadcasts carried some features of the story." [33]

After living in the glare of this publicity for weeks, petitioner came to court for a legal adjudication of the charges against him. As he approached the courthouse he was confronted by an army of photographers, reporters and television commentators shoving microphones in his face.[34] When he finally made his way into the courthouse it was reasonable for him to expect that he could have a respite from this merciless badgering and have his case adjudicated in a calm atmosphere. Instead, the carnival atmosphere of the September hearing served only to increase the publicity surrounding petitioner and to condition further the public's mind against him. Then, upon his entrance into the courtroom for his actual trial he was

---

[33] Petition for writ of certiorari, 35a.

[34] See Appendix, Photograph 4.

confronted with the sight of the television camera zeroed in on him and the ever-present still photographers snapping pictures of interest. As he opened a newspaper waiting for the proceedings to begin, the close-up lens of a television camera zoomed over his shoulder in an effort to find out what he was reading. In no sense did the dignity and integrity of the trial process shield this petitioner from the prejudicial publicity to which he had been exposed, because that publicity marched right through the courtroom door and made itself at home in heretofore unfamiliar surroundings. We stated in *Gideon* v. *Wainwright*, 372 U. S. 335, 344, "From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law." This principle was not applied by the courts below.

I believe petitioner in this case has shown that he was actually prejudiced by the conduct of these proceedings, but I cannot agree with those who say that a televised trial deprives a defendant of a fair trial only if "actual prejudice" can be shown. The prejudice of television may be so subtle that it escapes the ordinary methods of proof,[35] but it would gradually erode our fundamental conception of trial.[36] A defendant may be unable to prove that he was actually prejudiced by a televised trial, just as he may be unable to prove that the introduction of a coerced confession at his trial influenced the jury to convict him when there was substantial evidence to support his conviction aside from the confession, *Payne* v. *Arkansas, supra;* that the jury refrained from making a

---

[35] See, *e. g.,* Douglas, *supra,* note 25, at 844.

[36] Cf. *Fay* v. *New York,* 332 U. S. 261, 300 (dissenting opinion of Mr. Justice Murphy).

clear-cut determination on the voluntariness question, *Jackson* v. *Denno, supra;* that a particular judge was swayed by a direct financial interest in his conviction, *Tumey* v. *Ohio, supra;* or that the jury gave additional weight to the testimony of certain prosecution witnesses because of the jury's repeated contacts with those witnesses during the trial, *Turner* v. *Louisiana, supra.* How is the defendant to prove that the prosecutor acted differently than he ordinarily would have, that defense counsel was more concerned with impressing prospective clients than with the interests of the defendant, that a juror was so concerned with how he appeared on television that his mind continually wandered from the proceedings, that an important defense witness made a bad impression on the jury because he was "playing" to the television audience, or that the judge was a little more lenient or a little more strict than he usually might be? And then, how is petitioner to show that this combination of changed attitudes diverted the trial sufficiently from its purpose to deprive him of a fair trial? It is no answer to say that an appellate court can review for itself tapes or films of the proceedings. In the first place, it is not clear that the court would be able to obtain unedited tapes or films to review. Even with the cooperation of counsel on both sides, this Court was unable to obtain films of this trial which were in any sense complete. In addition, time limitations might restrict the television companies to taking pictures only of those portions of the trial that are most newsworthy and most likely to attract the attention of the viewing audience. More importantly, the tapes or films, even if unedited, could give a wrong impression of the proceedings. The camera which takes pictures cannot take a picture of itself. In addition, the camera cannot possibly cover the actions of all trial participants during the trial. While the camera is focused on the

judge who is apparently acting properly, a juror may be glancing up to see where the camera is pointing and counsel may be looking around to see whether he can confer with his client without the close-up lens of the camera focusing on them. Needless to say, the camera cannot penetrate the minds of the trial participants and show their awareness that they may at that moment be the subject of the camera's focus. The most the camera can show is that a formally correct trial took place, but our Constitution requires more than form.

I recognize that the television industry has shown in the past that it can be an enlightening and informing institution, but like other institutions it must respect the rights of others and cannot demand that we alter fundamental constitutional conceptions for its benefit. We must take notice of the inherent unfairness of television in the courtroom and rule that its presence is inconsistent with the "fundamental conception" of what a trial should be. My conviction that this is the proper holding in this case is buttressed by the almost unanimous condemnation of televised court proceedings by the judiciary in this country and by the strong opposition to the practice by the organized bar in this country. Canon 35 of the American Bar Association's Canons of Judicial Ethics prohibits the televising of court trials.[37] With only two, or possibly three exceptions,[38] the highest court of each

---

[37] The Canon provides in pertinent part:

"Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the court room, during sessions of the court or recesses between sessions, and the broadcasting or televising of court proceedings detract from the essential dignity of the proceedings, distract participants and witnesses in giving testimony, and create misconceptions with respect thereto in the mind of the public and should not be permitted."

[38] Colorado, *In re Hearings Concerning Canon 35 of the Canons of Judicial Ethics*, 296 P. 2d 465 (Colo. Sup. Ct. 1956), and Texas

State which has considered the question has declared that televised criminal trials are inconsistent with the Anglo-American conception of "trial." [39]  Similarly, Rule 53 of the Federal Rules of Criminal Procedure prohibits

permit televising of trials in the discretion of the trial judge.  The current situation in Oklahoma is unclear.  In *Lyles* v. *State*, 330 P. 2d 734 (1958), the Criminal Court of Appeals of Oklahoma stated that the televising of proceedings was in the discretion of the trial judge.  In 1959, however, the Supreme Court adopted a rule prohibiting television during actual proceedings.  Okla. Stat. Ann., Tit. 5, at 65–66 (1963 Supp.).  Nevertheless, in 1961 the court again stated that the televising of trials is a matter for the trial judge's discretion.  *Cody* v. *State*, 361 P. 2d 307 (Ct. Crim. App. Okla. 1961).

[39] With the exceptions stated in note 38, *supra*, no State affirmatively permits televised trials.  It has been stated that Canon 35 is in effect in 30 States.  48 J. Am. Jud. Soc. 80 (1964); Brief for Petitioner, p. 39.  It is difficult to verify this figure because of the lack of uniformity among the States in reporting their court rules.  However, the following States have clearly adopted Canon 35, or its equivalent: Alaska, Alaska Rules Crim. Proc. 48; Arizona, Ariz. Sup. Ct. Rule 45, 17 Ariz. Rev. Stat. Ann., at 40; Connecticut, Conn. Practice Book 27 (1963); Delaware, Del. Sup. Ct. Rule 33, 13 Del. Code Ann., at 23 (1964 Supp.) (adopted Canon 35 in its pre-1952 form, which does not explicitly prohibit television, but does prohibit "the taking of photographs" and "broadcasting of court proceedings"); Florida, Code of Ethics, Rule A35, 31 Fla. Stat. Ann., at 285 (1964 Supp.), see *Brumfield* v. *State*, 108 So. 2d 33 (Fla. Sup. Ct. 1958); Hawaii, Hawaii Sup. Ct. Rule 16, 43 Haw. 450; Illinois, 1964 Ann. Rep. of the Ill. Judicial Conference 168–169, see *People* v. *Ulrich*, 376 Ill. 461, 34 N. E. 2d 393 (1941), *People* v. *Munday*, 280 Ill. 32, 117 N. E. 286 (1917); Iowa, Iowa Sup. Ct. Rule 119, 40 Iowa Code Ann., c. 610 (1964 Supp.); Kansas, Kansas Sup. Ct. Rule 117, 191 Kan. xxiv (1963) (does not refer specifically to television); Kentucky, Ky. Ct. App. Rule 3.170, Russell's Kentucky Practice and Service 21 (1964); Louisiana, Canon of Judicial Ethics XXIII, 242 La. LI (1960); Michigan, Canon of Judicial Ethics 35, Callaghan's Michigan Pleading and Practice, Rules at 422–423 (2d ed. 1962); New Jersey, Canon of Judicial Ethics 35, 1 Waltzinger, New Jersey Practice 299 (Rev. ed. 1954); New Mexico, N. M. Sup. Ct. Rule 27, 4 N. M. Stat. Ann., at 95 (1963 Supp.); New York, N. Y. Rules of

the "broadcasting" of trials,[40] and the Judicial Confer-
ence of the United States has unanimously condemned
televised trials.[41]   This condemnation rests on more than
notions of policy; it arises from an understanding of the

---

the Administrative Board of the Judicial Conference, Rule 5, N. Y.
Judiciary Law, at 320 (1964 Supp.); Ohio, 176 Ohio St. lxiv (1964),
see *State* v. *Clifford*, 162 Ohio St. 370, 123 N. E. 2d 8 (1954), cert.
denied, 349 U. S. 929; Tennessee, Tenn. Sup. Ct. Rule 38, 209 Tenn.
818 (1961); Virginia, 201 Va. cvii (1960) (prohibits taking of photo-
graphs and broadcasting, although it does not refer specifically to
television); Washington, 61 Wash. 2d xxviii (1963); West Virginia,
141 W. Va. viii (1955).

In addition, Brand, Bar Associations, Attorneys and Judges (1956
and 1959 Supp.) reports that the Idaho Supreme Court adopted
Canon 35 in its present form and the Supreme Courts of Oregon,
South Dakota and Utah adopted the Canon when it merely prohibited
"photographing" and "broadcasting" without specifically mentioning
television.   It has also been reported that the Supreme Court of
Arkansas adopted Canon 35.   44 J. Am. Jud. Soc. 120 (1960).

Moreover, the Supreme Court of California assumed it was "im-
proper" to televise criminal proceedings in *People* v. *Stroble*, 36 Cal.
2d 615, 226 P. 2d 330 (1951), affirmed 343 U. S. 181, rehearing denied
343 U. S. 952; see the rule adopted by the Conference of California
Judges, 24 Cal. State Bar J. 299 (1949); the Court of Appeals of
Maryland in *Ex parte Sturm*, 152 Md. 114, 122, 136 A. 312, 315
(1927), used language indicating that Maryland would probably bar
television from the courtroom if faced with the problem; and the
Supreme Court of Pennsylvania cited with approval Canon 35 in
*Mack Appeal*, 386 Pa. 251, 257, n.5, 126 A. 2d 679, 681–682, n.4
(1956), cert. denied, 352 U. S. 1002, see 48 J. Am. Jud. Soc. 200
(1965).

[40] Rule 53 provides:
"The taking of photographs in the court room during the progress
of judicial proceedings or radio broadcasting of judicial proceedings
from the court room shall not be permitted by the court."

[41] "Resolved, That the Judicial Conference of the United States
condemns the taking of photographs in the courtroom or its environs
in connection with any judicial proceedings, and the broadcasting of
judicial proceedings by radio, television, or other means, and con-
siders such practices to be inconsistent with fair judicial procedure

constitutional conception of the term "trial." Such a general consensus is certainly relevant to this Court's determination of the question. See *Mapp* v. *Ohio,* 367 U. S. 643, 651.

### IV.

Nothing in this opinion is inconsistent with the constitutional guarantees of a public trial and the freedoms of speech and the press.

This Court explained in *In re Oliver,* 333 U. S. 257, 266, 270, that the public trial provision of the Sixth Amendment is a "guarantee to an accused" designed to "safeguard against any attempt to employ our courts as instruments of persecution." Clearly the openness of the proceedings provides other benefits as well: it arguably improves the quality of testimony, it may induce unknown witnesses to come forward with relevant testimony, it may move all trial participants to perform their duties conscientiously, and it gives the public the opportunity to observe the courts in the performance of their duties and to determine whether they are performing adequately.[42] But the guarantee of a public trial confers no special benefit on the press, the radio industry or the television industry. A public trial is a necessary component of an accused's right to a fair trial and the concept of public trial cannot be used to defend conditions which prevent the trial process from providing a fair and reliable determination of guilt.

To satisfy the constitutional requirement that trials be public it is not necessary to provide facilities large enough

---

and that they ought not to be permitted in any federal court." Annual Report of the Proceedings of the Judicial Conference of the United States, March 8–9, 1962, p. 10.

[42] See, *e. g.,* 3 Blackstone, Commentaries on the Laws of England 372–373 (15th ed. 1809); 6 Wigmore, Evidence 332–335 (3d ed. 1940).

for all who might like to attend a particular trial, since to do so would interfere with the integrity of the trial process and make the publicity of trial proceedings an end in itself. Nor does the requirement that trials be public mean that observers are free to act as they please in the courtroom, for persons who attend trials cannot act in such a way as to interfere with the trial process, see *Moore* v. *Dempsey, supra.* When representatives of the communications media attend trials they have no greater rights than other members of the public. Just as an ordinary citizen might be prohibited from using field glasses or a motion picture camera in the courthouse because by so doing he would interfere with the conduct of the trial, representatives of the press and broadcasting industries are subject to similar limitations when they attend court. Since the televising of criminal trials diverts the trial process from its proper end, it must be prohibited. This prohibition does not conflict with the constitutional guarantee of a public trial, because a trial is public, in the constitutional sense, when a courtroom has facilities for a reasonable number of the public to observe the proceedings, which facilities are not so small as to render the openness negligible and not so large as to distract the trial participants from their proper function, when the public is free to use those facilities, and when all those who attend the trial are free to report what they observed at the proceedings.

Nor does the exclusion of television cameras from the courtroom in any way impinge upon the freedoms of speech and the press. Court proceedings, as well as other public matters, are proper subjects for press coverage.

> "A trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose

none would claim that the judge could punish the publisher for contempt. And we can see no difference though the conduct of the attorneys, of the jury, or even of the judge himself, may have reflected on the court. Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." [43]

So long as the television industry, like the other communications media, is free to send representatives to trials and to report on those trials to its viewers, there is no abridgment of the freedom of press. The right of the communications media to comment on court proceedings does not bring with it the right to inject themselves into the fabric of the trial process to alter the purpose of that process.

In summary, television is one of the great inventions of all time and can perform a large and useful role in society. But the television camera, like other technological innovations, is not entitled to pervade the lives of everyone in disregard of constitutionally protected rights.[44] The television industry, like other institutions, has a proper area of activities and limitations beyond which it cannot go with its cameras. That area does not extend into an American courtroom. On entering that

---

[43] *Craig* v. *Harney*, 331 U. S. 367, 374. See *Bridges* v. *California*, 314 U. S. 252; *Pennekamp* v. *Florida*, 328 U. S. 331.

[44] Compare *Olmstead* v. *United States*, 277 U. S. 438, 471 (dissenting opinion of Mr. Justice Brandeis); *On Lee* v. *United States*, 343 U. S. 747, 762 (dissenting opinion of MR. JUSTICE DOUGLAS); *Silverman* v. *United States*, 365 U. S. 505; *Lopez* v. *United States*, 373 U. S. 427, 445–446 (opinion concurring in the result), 465 (dissenting opinion of MR. JUSTICE BRENNAN).

hallowed sanctuary, where the lives, liberty and property of people are in jeopardy, television representatives have only the rights of the general public, namely, to be present, to observe the proceedings, and thereafter, if they choose, to report them.

[For opinion of HARLAN, J., concurring, see *post,* p. 587.]

PHOTOGRAPH 1. This photograph shows the activities of still and motion picture photographers at the September hearing on petitioner's motion to exclude cameras from the courtroom.

PHOTOGRAPH 2.   This photograph shows the concentration of television, still and motion picture cameras at the September hearing.

PHOTOGRAPH 3. This photograph shows the television motor van stationed outside the courtroom during the September hearing.

773-305 O - 65 (Face p. 586) No. 3

773-305 O - 65 (Face p. 586) No. 4

PHOTOGRAPH 4.  This photograph shows petitioner trying to make his way into the courtroom for the September hearing.

PHOTOGRAPH 5.　This photograph shows various cameras focused on petitioner at the September hearing to exclude cameras from the courtroom.

PHOTOGRAPH 6.   This photograph shows the television booth as it appeared on
October 22.

PHOTOGRAPH 7. This photograph shows the television booth as it appeared on
October 23 and for the rest of the trial.

Mr. Justice Harlan, concurring.

I concur in the opinion of the Court, subject, however, to the reservations and only to the extent indicated in this opinion.

The constitutional issue presented by this case is far-reaching in its implications for the administration of justice in this country. The precise question is whether the Fourteenth Amendment prohibits a State, over the objection of a defendant, from employing television in the courtroom to televise contemporaneously, or subsequently by means of videotape, the courtroom proceedings of a criminal trial of widespread public interest. The issue is no narrower than this because petitioner has not asserted any isolatable prejudice resulting from the presence of television apparatus within the courtroom or from the contemporaneous or subsequent broadcasting of the trial proceedings. On the other hand, the issue is no broader, for we are concerned here only with a criminal trial of great notoriety, and not with criminal proceedings of a more or less routine nature.

The question is fraught with unusual difficulties. Permitting television in the courtroom undeniably has mischievous potentialities for intruding upon the detached atmosphere which should always surround the judicial process. Forbidding this innovation, however, would doubtless impinge upon one of the valued attributes of our federalism by preventing the States from pursuing a novel course of procedural experimentation. My conclusion is that there is no constitutional requirement that television be allowed in the courtroom, and, at least as to a notorious criminal trial such as this one, the considerations against allowing television in the courtroom so far outweigh the countervailing factors advanced in its support as to require a holding that what was done in this case infringed the fundamental right to a fair trial assured by the Due Process Clause of the Fourteenth Amendment.

Some preliminary observations are in order: All would agree, I am sure, that at its worst, television is capable of distorting the trial process so as to deprive it of fundamental fairness. Cables, kleig lights, interviews with the principal participants, commentary on their performances, "commercials" at frequent intervals, special wearing apparel and makeup for the trial participants—certainly such things would not conduce to the sound administration of justice by any acceptable standard. But that is not the case before us. We must judge television as we find it in this trial—relatively unobtrusive, with the cameras contained in a booth at the back of the courtroom.

I.

No constitutional provision guarantees a right to televise trials. The "public trial" guarantee of the Sixth Amendment, which reflects a concept fundamental to the administration of justice in this Country, *In re Oliver,* 333 U. S. 257, certainly does not require that television be admitted to the courtroom. See *United Press Assns.* v. *Valente,* 308 N. Y. 71, 123 N. E. 2d 777. Essentially, the public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings. *In re Oliver, supra,* at 266–273. A fair trial is the objective, and "public trial" is an institutional safeguard for attaining it.

Thus the right of "public trial" is not one belonging to the public, but one belonging to the accused, and inhering in the institutional process by which justice is administered. Obviously, the public-trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats. The guarantee will already have been met, for the "public" will be present in the form of those per-

sons who did gain admission. Even the actual presence of the public is not guaranteed. A public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and observe the trial process. It does not give anyone a concomitant right to photograph, record, broadcast, or otherwise transmit the trial proceedings to those members of the public not present, although to be sure, the guarantee of public trial does not of itself prohibit such activity.

The free speech and press guarantees of the First and Fourteenth Amendments are also asserted as embodying a positive right to televise trials, but the argument is greatly overdrawn. Unquestionably, television has become a very effective medium for transmitting news. Many trials are newsworthy, and televising them might well provide the most accurate and comprehensive means of conveying their content to the public. Furthermore, television is capable of performing an educational function by acquainting the public with the judicial process in action. Albeit these are credible policy arguments in favor of television, they are not arguments of constitutional proportions. The rights to print and speak, over television as elsewhere, do not embody an independent right to bring the mechanical facilities of the broadcasting and printing industries into the courtroom. Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public. Within the courthouse the only relevant constitutional consideration is that the accused be accorded a fair trial. If the presence of television substantially detracts from that goal, due process requires that its use be forbidden.

I see no force in the argument that to exclude television apparatus from the courtroom, while at the same time permitting newspaper reporters to bring in their pencils and notebooks, would discriminate in favor of the press as against the broadcasting services. The distinctions to be drawn between the accouterments of the press and the television media turn not on differences of size and shape but of function and effect. The presence of the press at trials may have a distorting effect, but it is not caused by their pencils and notebooks. If it were, I would not hesitate to say that such physical paraphernalia should be barred.

## II.

The probable impact of courtroom television on the fairness of a trial may vary according to the particular kind of case involved. The impact of television on a trial exciting wide popular interest may be one thing; the impact on a run-of-the-mill case may be quite another. Furthermore, the propriety of closed circuit television for the purpose of making a court recording or for limited use in educational institutions obviously presents markedly different considerations. The Estes trial was a heavily publicized and highly sensational affair. I therefore put aside all other types of cases; in so doing, however, I wish to make it perfectly clear that I am by no means prepared to say that the constitutional issue should ultimately turn upon the nature of the particular case involved. When the issue of television in a non-notorious trial is presented it may appear that no workable distinction can be drawn based on the type of case involved, or that the possibilities for prejudice, though less severe, are nonetheless of constitutional proportions. Compare *Powell* v. *Alabama,* 287 U. S. 45; *Betts* v. *Brady,* 316 U. S. 455; *Gideon* v. *Wainwright,* 372 U. S. 335. The resolution of those further questions should await an appropriate case; the

Court should proceed only step by step in this unplowed field. The opinion of the Court necessarily goes no farther, for only the four members of the majority who unreservedly join the Court's opinion would resolve those questions now.

I do not deem the constitutional inquiry in this case ended by the finding, in effect conceded by petitioner's counsel, that no isolatable prejudice was occasioned by the manner in which television was employed in this case.[1] Courtroom television introduces into the conduct of a criminal trial the element of professional "showmanship," an extraneous influence whose subtle capacities for serious mischief in a case of this sort will not be underestimated by any lawyer experienced in the elusive imponderables of the trial arena. In the context of a trial of intense public interest, there is certainly a strong possibility that the timid or reluctant witness, for whom a court appearance even at its traditional best is a harrowing affair, will become more timid or reluctant when he finds that he will also be appearing before a "hidden audience" of unknown but large dimensions. There is certainly a strong possibility that the "cocky" witness having a thirst for the limelight will become more "cocky" under the influence of television. And who can say that the juror who is gratified by having been chosen for a front-line case, an ambitious prosecutor, a publicity-minded defense counsel, and even a conscientious judge will not stray, albeit unconsciously, from doing what "comes naturally" into pluming themselves for a satisfactory television "performance"?

---

[1] The trial judge ordered that there was to be no audio transmission of the witnesses' testimony. The witnesses, however, were present at the September hearing when everything was broadcast, and the record does not show affirmatively that they were aware that the microphone which confronted them during the actual trial was not being used for the same purpose.

Surely possibilities of this kind carry grave potentialities for distorting the integrity of the judicial process bearing on the determination of the guilt or innocence of the accused, and, more particularly, for casting doubt on the reliability of the fact-finding process carried on under such conditions. See Douglas, The Public Trial and the Free Press, 46 A. B. A. J. 840 (1960). To be sure, such distortions may produce no telltale signs, but in a highly publicized trial the danger of their presence is substantial, and their effects may be far more pervasive and deleterious than the physical disruptions which all concede would vitiate a conviction. A lively public interest could increase the size of the viewing audience immensely, and the masses of spectators to whom the trial is telecast would have become emotionally involved with the case through the dissemination of pretrial publicity, the usual concomitant of such a case. The presence of television would certainly emphasize to the trial participants that the case is something "special." Particularly treacherous situations are presented in cases where pretrial publicity has been massive [2] even when jurors positively state they will not be influenced by it; see *Rideau* v. *Louisiana,* 373 U. S. 723; *Irvin* v. *Dowd,* 366 U. S. 717. To increase the possibility of influence and the danger of a "popular verdict" by subjecting the jurors to the view of a mass audience whose approach to the case has been conditioned by pretrial publicity can only make a bad situation worse. The entire thrust of rules of evidence and the other protections attendant upon the modern trial is to keep extraneous influences out of the courtroom. *Turner* v. *Louisiana,* 379 U. S. 466, 472–473. As we recently observed in *Turner,* "Mr. Justice Holmes stated no more than a truism when he observed that 'Any judge who has sat with juries knows that in spite of forms they

---

[2] Petitioner in this case amassed 11 volumes of pretrial press clippings.

are extremely likely to be impregnated by the environing atmosphere.' *Frank* v. *Mangum,* 237 U. S. 309, at 349 (dissenting opinion)." *Id.,* at 472.[3]  The knowledge on the part of the jury and other trial participants that they are being televised to an emotionally involved audience can only aggravate the atmosphere created by pretrial publicity.

The State argues that specific prejudice must be shown for the Due Process Clause to apply.  I do not believe that the Fourteenth Amendment is so impotent when the trial practices in question are instinct with dangers to constitutional guarantees.  I am at a loss to understand how the Fourteenth Amendment can be thought not to encompass protection of a state criminal trial from the dangers created by the intrusion of collateral and wholly irrelevant influences into the courtroom.  The Court has not hesitated in the past to condemn such practices, even without any positive showing of isolatable prejudice.  In *Turner* v. *Louisiana, supra,* decided just this Term, we held that the "potentialities" for distortion of the trial created by a key witness serving as bailiff to a sequestered jury were sufficient to violate the Due Process Clause of the Fourteenth Amendment.  In *Jackson* v. *Denno,* 378 U. S. 368, the Court made the judgment that a trial judge's determination of a coerced-confession issue is more likely to avoid prejudice than a jury determination, a judgment which indeed overrode a long-standing contrary state practice.  And in *Irvin* v. *Dowd,* 366 U. S. 717, we held that flamboyant pretrial publicity cast sufficient doubt on the impartiality of the jury to vitiate a conviction, even in the face of statements by all the jurors that they were not subject to its influence.  See 366 U. S., at 729 (Frankfurter, J., concurring).  Other examples of

---

[3] The Court had occasion to recognize in *Cox* v. *Louisiana,* 379 U. S. 559, 565, that even "judges are human" and not immune from outside environmental influences.

instances in which the Court has exercised its judgment as to the effects of one thing or another on human behavior are plentiful. See, *e. g., Griffin* v. *California,* 380 U. S. 609; *Tancil* v. *Woolls,* 379 U. S. 19; *Mapp* v. *Ohio,* 367 U. S. 643 (compare *People* v. *Defore,* 242 N. Y. 13, 150 N. E. 585); *Avery* v. *Georgia,* 345 U. S. 559; *Brown* v. *Board of Education,* 347 U. S. 483; *Tumey* v. *Ohio,* 273 U. S. 510.

The judgment that the presence of television in the courtroom represents a serious danger to the trial process is supported by a vast segment of the Bar of this country, as evidenced by Canon 35 of the Canons of Judicial Ethics of the American Bar Association, counseling against such practices,[4] the views of the Judicial Conference of the United States (*infra,* p. 601), Rule 53 of the Federal Rules of Criminal Procedure, and even the "personal views" (*post,* pp. 601–602) of the Justices on the dissenting side of the present case.

The arguments advanced against the constitutional banning of televised trials seem to me peculiarly unpersuasive. It is said that the pictorial broadcasting of trials will serve to educate the public as to the nature of the judicial process. Whatever force such arguments might have in run-of-the-mill cases, they carry little weight in cases of the sort before us, where the public's interest in viewing the trial is likely to be engendered more by curiosity about the personality of the well-known figure who is the defendant (as here), or about famous witnesses or lawyers who will appear on the television screen, or about the details of the particular crime involved, than by innate curiosity to learn about the workings of the judicial process itself. Indeed it would be naive not to suppose that it would be largely such factors that would qualify a trial for commercial television

---

[4] The consistent position of the American Bar Association is set out in the Appendix.

"billing," and it is precisely that kind of case where the risks of permitting television coverage of the proceedings are at their greatest.

It is also asserted that televised trials will cause witnesses to be more truthful, and jurors, judges, and lawyers more diligent. To say the least this argument is sophistic, for it is impossible to believe that the reliability of a trial as a method of finding facts and determining guilt or innocence increases in relation to the size of the crowd which is watching it. Attendance by interested spectators in the courtroom will fully satisfy the safeguards of "public trial." Once openness is thus assured, the addition of masses of spectators would, I venture to say, detract rather than add to the reliability of the process. See *Cox* v. *Louisiana,* 379 U. S. 559, 562. A trial in Yankee Stadium, even if the crowd sat in stony silence, would be a substantially different affair from a trial in a traditional courtroom under traditional conditions, and the difference would not, I think, be that the witnesses, lawyers, judges, and jurors in the stadium would be more truthful, diligent, and capable of reliably finding facts and determining guilt or innocence.[5] There will be no disagreement, I am sure, among those competent to judge that precisely the opposite would likely be the case.

Finally, we should not be deterred from making the constitutional judgment which this case demands by the prospect that the day may come when television will have become so commonplace an affair in the daily life of the average person as to dissipate all reasonable likelihood that its use in courtrooms may disparage the judicial process. If and when that day arrives the constitutional

---

[5] There may, of course, be a difference in impact upon the atmosphere and trial participants between the physical presence of masses of people and the presence of a camera lens which permits masses of people to observe the process remotely. However, the critical element is the knowledge of the trial participants that they are subject to such visual observation, an element which is, of course, present in this case.

judgment called for now would of course be subject to re-examination in accordance with the traditional workings of the Due Process Clause. At the present juncture I can only conclude that televised trials, at least in cases like this one, possess such capabilities for interfering with the even course of the judicial process that they are constitutionally banned. On these premises I concur in the opinion of the Court.

## APPENDIX TO OPINION OF MR. JUSTICE HARLAN, CONCURRING.

The development of Canon 35 is set out at length in the *amicus curiae* brief of the American Bar Association, pp. 3–8, as follows:

"It [Canon 35] was originally adopted on September 30, 1937 by the House of Delegates[1] in the following form:

" 'Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the court room, during sessions of the court or recesses between sessions, and the broadcasting of court proceedings are calculated to detract from the essential dignity of the proceedings, degrade the court and create misconceptions with respect thereto in the mind of the public and should not be permitted.' 62 A. B. A. Rep. 1134–35 (1937).

"A Special Committee on Cooperation Between Press, Radio and Bar, as to Publicity Interfering with Fair Trial of Judicial and Quasi-Judicial Proceedings had reported to the Association its grave concern with the dangers attendant upon the use of radio in connection with trials, par-

---

[1] "The House of Delegates is not only the governing body of the American Bar Association; because of the presence of representatives of all State Bar Associations, the largest and most important local bar associations, and of other important national professional groups, it is in fact a broadly representative policy forum for the profession as a whole."

ticularly in light of the spectacular publicity and broadcast of the trial of Bruno Hauptmann.[2] The Committee specifically referred to the evil of 'trial in the air'.[3] 62 A. B. A. Rep. 860 (1937).

"After the adoption of Judicial Canon 35, the direct radio broadcasting of court proceedings was disapproved by the Association's Committee on Professional Ethics and Grievances in its Opinion No. 212, March 15, 1941, as being specifically condemned. The Committee quoted with approval the following statement of the Michigan and Detroit Bar Associations:

> " 'Such broadcasts are unfair to the defendant and to the witnesses. The natural embarrassment and confusion of a citizen on trial should not be increased by a realization that his voice and his difficulties are being used as entertainment for a vast radio audience. The fear expressed by most persons when facing an audience or microphone is a matter of common knowledge, and but few defendants or witnesses can properly concentrate on facts and testify fully and fairly when so handicapped. . . . Such broadcasts are unfair to the Judge, who should be permitted to devote his undivided attention to the case, unmindful of the effect which his comments or decision may

---

[2] "See *State* v. *Hauptmann*, 115 N.J.L. 412, 180 Atl. 809 (Ct. Err. & App.), *cert. denied*, 296 U. S. 649 (1935)."

[3] "Prior to the adoption of Judicial Canon 35, the impropriety of permitting radio broadcasts of court proceedings was recognized by the Committee on Professional Ethics and Grievances of the Association in its Opinion No. 67, March 21, 1932. The Committee had recourse to Judicial Canon 34 which provides that a judge should not administer his office 'for the purpose of advancing his personal ambitions or increasing his popularity.' The Committee found that radio broadcasting of a trial changes 'what should be the most serious of human institutions either into an enterprise for the entertainment of the public or of one for promoting publicity for the judge.' AMERICAN BAR ASSOCIATION, OPINIONS OF THE COMMITTEE ON PROFESSIONAL ETHICS AND GRIEVANCES 163 (1957)."

have upon the radio audience.' AMERICAN BAR ASSOCIATION, OPINIONS OF THE COMMITTEE ON PROFESSIONAL ETHICS AND GRIEVANCES 426 (1957).

"In 1952, the growing prominence of television as a medium of mass communication was dealt with in a report of the Special Committee on Televising and Broadcasting Legislative and Judicial Proceedings [headed by the late John W. Davis]. 77 A. B. A. REP. 607 (1952). In condemning the practice of televising judicial proceedings, the Committee called attention to the fact that:

> " 'The attention of the court, the jury, lawyers and witnesses should be concentrated upon the trial itself and ought not to be divided with the television or broadcast audience who for the most part have merely the interest of curiosity in the proceedings. It is not difficult to conceive that all participants may become over-concerned with the impression their actions, rulings or testimony will make on the absent multitude.' Id. at 610.

"As a result of this report, and the recommendation of the Committee on Professional Ethics and Grievances, Judicial Canon 35 was amended by inserting a ban on the 'televising' of court proceedings and inserting the descriptive phrase 'distract the witness in giving his testimony' before the phrase 'degrade the court.' In addition, a second paragraph was added providing for the televising and broadcasting of certain ceremonial proceedings. Id. at 110–11.

"In October, 1954, the Board of Governors authorized the appointment of a Special Bar-Media Conference Committee on Fair Trial-Free Press to meet with representatives of the press, radio, and television. The views of both sides were thoroughly explored and were presented in detail in the September, 1956 issue of the American Bar Association Journal.[4] After extensive joint debate,

---

[4] "42 A.B.A.J. 834, 838, 843 (1956)."

no solutions or agreements were reached. 83 A. B. A. REP. 790–91 (1958). The Committee did report that it was convinced that

> " 'courtroom photographing or broadcasting or both would impose undue police duties upon the trial judge[,] . . . that the broadcasting and the photographing in the courtroom might have an adverse psychological effect upon trial participants, judges, lawyers, witnesses and juries[,] . . . [and] that partial broadcasts of trials, particularly on television, might influence public opinion which in turn might influence trial results. . . .' *Id.* at 645.

"Following the presentation of the Bar-Media Conference Committee report and in connection with the consideration of a report and recommendation of a Special Committee of the American Bar Foundation created in July, 1955 (83 A. B. A. REP. 643–45 (1958)), the House of Delegates conducted a hearing as a 'Committee of the Whole' during its February, 1958 session at which proponents and opponents of Judicial Canon 35 were fully heard. 83 A. B. A. REP. 648–69 (1958). Thereafter, at the August, 1958 meeting of the House of Delegates, it was decided to have a Special Committee study Canon 35 and

> " 'conduct further studies of the problem, including the obtaining of a body of reliable factual data on the experience of judges and lawyers in those courts where either photography, televising or broadcasting, or all of them, are permitted. . . . The fundamental objective of the Committee and of all others interested must be to consider and make recommendations which will preserve the right of fair trial.' 83 A. B. A. REP. 284 (1958).

"The Special Committee filed an Interim Report and Recommendations with the House of Delegates in August,

1962 setting forth the 'Area and Perspective' of its survey and studies. The report included portions of testimony by media representatives taken at a hearing held in Chicago on February 18, 1962, as well as a summary of the Committee's informal conference with certain representatives from Colorado and Texas. In addition, the report included written comments by officers of State Bar Associations responding to a Committee survey, and certain general correspondence received by the Committee regarding Judicial Canon 35. The report also listed significant publications favoring either revision or retention of the Canon. . . . [Hereinafter cited *Int. Rep.*]

"The Special Committee thereafter submitted its final report and recommendations, concluding that the substantive provisions of Judicial Canon 35 remain valid and 'should be retained as essential safeguards of the individual's inviolate and personal right of fair trial.' . . . The Committee did recommend certain minor deletions . . . and changes . . . which were adopted by the House of Delegates, after full debate, on February 5, 1963:

> " 'The taking of photographs in the court room, during sessions of the court or recesses between sessions, and the broadcasting or televising of court proceedings [are calculated to] detract from the essential dignity of the proceedings, distract [the] *participants and* witnesses in giving [his] testimony, [degrade the court] and create misconceptions with respect thereto in the mind of the public and should not be permitted.' [5]

---

[5] "The full text of Judicial Canon 35, as amended, is as follows:
" 'IMPROPER PUBLICIZING OF COURT PROCEEDINGS
" 'Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the court room, during sessions of the court or recesses between sessions, and the broadcasting or televising of court proceedings detract from the essential dignity of the proceedings, distract participants and witnesses in giving

"A vast majority of the states have voluntarily adopted Judicial Canon 35 in one form or another, and it has been embodied in principle in Rule 53 of the Federal Rules of Criminal Procedure. In a recent Resolution of the Judicial Conference of the United States, the philosophy of Canon 35 was unanimously reaffirmed:

> " 'Resolved, That the Judicial Conference of the United States condemns the taking of photographs in the courtroom or its environs in connection with any judicial proceeding, and the broadcasting of judicial proceedings by radio, television, or other means, and considers such practices to be inconsistent with fair judicial procedure and that they ought not to be permitted in any federal court.' *Int. Rep.* p. 97."

(Footnotes numbered and partially omitted.)

MR. JUSTICE STEWART, whom MR. JUSTICE BLACK, MR. JUSTICE BRENNAN, and MR. JUSTICE WHITE join, dissenting.

I cannot agree with the Court's decision that the circumstances of this trial led to a denial of the petitioner's Fourteenth Amendment rights. I think that the introduction of television into a courtroom is, at least in the present state of the art, an extremely unwise policy. It invites many constitutional risks, and it detracts from the inherent dignity of a courtroom. But I am unable to escalate this personal view into a *per se* constitutional

---

testimony, and create misconceptions with respect thereto in the mind of the public and should not be permitted.

" 'Provided that this restriction shall not apply to the broadcasting or televising, under the supervision of the court, of such portions of naturalization proceedings (other than the interrogation of applicants) as are designed and carried out exclusively as a ceremony for the purpose of publicly demonstrating in an impressive manner the essential dignity and the serious nature of naturalization.' "

rule. And I am unable to find, on the specific record of this case, that the circumstances attending the limited televising of the petitioner's trial resulted in the denial of any right guaranteed to him by the United States Constitution.

On October 22, 1962, the petitioner went to trial in the Seventh Judicial District Court of Smith County, Texas, upon an indictment charging him with the offenses of (1) swindling, (2) theft by false pretenses, and (3) theft by a bailee. After a week spent in selecting a jury, the trial itself lasted some three and a half days. At its conclusion the jury found the petitioner guilty of the offense of swindling under the first count of the indictment. The trial judge permitted portions of the trial proceedings to be televised, under the limitations described below. He also gave news photographers permission to take still pictures in the courtroom under specified conditions.

The Texas Court of Criminal Appeals affirmed the petitioner's conviction, and we granted certiorari, limited to a single question. The question, as phrased by the petitioner, is this:

"Whether the action of the trial court, over petitioner's continued objection, denied him due process of law and equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States, in requiring petitioner to submit to live television of his trial, and in refusing to adopt in this all out publicity case, as a rule of trial procedure, Canon 35 of the Canons of Judicial Ethics of the American Bar Association, and instead adopting and following, over defendant's objection, Canon 28 of the Canons of Judicial Ethics, since approved by the Judicial Section of the integrated (State agency) State Bar of Texas."

The two Canons of Judicial Ethics referred to in the petitioner's statement of the question presented are set

out in the margin.[1]  But, as the Court rightly says, the
problem before us is not one of choosing between the con-
flicting guidelines reflected in these Canons of Judicial
Ethics.  It is a problem rooted in the Due Process Clause
of the Fourteenth Amendment.  We deal here with mat-
ters subject to continuous and unforeseeable change—the

---

[1] Canons of Judicial Ethics.  American Bar Association: Judicial
Canon 35.  Improper publicizing of Court proceedings.

"Proceedings in court should be conducted with fitting dignity and
decorum.  The taking of photographs in the court room, during
sessions of the court or recesses between sessions, and the broad-
casting or televising of court proceedings detract from the essential
dignity of the proceedings, distract participants and witnesses in giv-
ing testimony, and create misconceptions with respect thereto in the
mind of the public and should not be permitted.

"Provided that this restriction shall not apply to the broadcasting
or televising, under the supervision of the court, of such portions of
naturalization proceedings (other than the interrogation of appli-
cants) as are designed and carried out exclusively as a ceremony for
the purpose of publicly demonstrating in an impressive manner the
essential dignity and the serious nature of naturalization."

Canons of Judicial Ethics, Integrated State Bar of Texas: Judicial
Canon 28.  Improper Publicizing of Court Proceedings.

"Proceedings in court should be conducted with fitting dignity and
decorum.  The taking of photographs in the court room, during
sessions of the court or recesses between sessions, and the broadcast-
ing or televising of court proceedings unless properly supervised and
controlled, may detract from the essential dignity of the proceedings,
distract participants and witnesses in giving testimony, and create
misconceptions with respect thereto in the mind of the public.  The
supervision and control of such trial coverage shall be left to the
trial judge who has the inherent power to exclude or control coverage
in the proper case in the interest of justice.

"In connection with the control of such coverage the following
declaration of principles is adopted:

"(1) There should be no use of flash bulbs or other artificial
lighting.

"(2) No witness, over his expressed objection, should be photo-
graphed, his voice broadcast or be televised.

"(3) The representatives of news media must obtain permission
of the trial judge to cover by photograph, broadcasting or televising,

techniques of public communication. In an area where all the variables may be modified tomorrow, I cannot at this time rest my determination on hypothetical possibilities not present in the record of this case. There is no claim here based upon any right guaranteed by the First Amendment. But it is important to remember that we move in an area touching the realm of free communication, and for that reason, if for no other, I would be wary of imposing any *per se* rule which, in the light of future technology, might serve to stifle or abridge true First Amendment rights.

## I.

The indictment was originally returned by a grand jury in Reeves County, Texas, and it engendered widespread publicity. After some preliminary proceedings there, the case was transferred for trial to Smith County, more than 500 miles away. The trial was set for September 24, 1962, but it did not commence on that date. Instead, that day and the next were spent in hearings on two motions filed by defense counsel: a motion to bar television and news cameras from the trial, and a motion to continue the trial to a later date. Those proceedings were themselves telecast "live," and news photographers were permitted to take pictures in the courtroom. The activities of the television crews and news photographers led to considerable disruption of the hearings.[2] At the con-

---

and shall comply with the rules prescribed by the judge for the exercise of the privilege.

"(4) Any violation of the Court's Rules shall be punished as a contempt.

"(5) Where a judge has refused to allow coverage or has regulated it, any attempt, other than argument by representatives of the news media directly with the Court, to bring pressure of any kind on the judge, pending final disposition of the cause in trial, shall be punished as a contempt."

[2] A contemporary newspaper account described the scene as follows:

"A television motor van, big as an intercontinental bus, was parked outside the courthouse and the second-floor courtroom was a forest

clusion of the hearings the motion for a continuance was granted, and the case reset for trial on October 22. The motion to bar television and news photographers from the trial was denied.[3]

of equipment. Two television cameras had been set up inside the bar and four more marked cameras were aligned just outside the gates.

"A microphone stuck its 12-inch snout inside the jury box, now occupied by an overflow of reporters from the press table, and three microphones confronted Judge Dunagan on his bench. [C]ables and wires snaked over the floor." The New York Times, September 25, 1962, p. 46, col. 4.

[3] In ruling on the motion, the trial judge stated:

"In the past, it has been the policy of this Court to permit televising in the court room under the rules and supervision of the Court. Heretofore, I have not encountered any difficulty with it. I was unable to observe any detraction from the witnesses or the attorneys in those cases. We have watched television, of course, grow up from its infancy and now into its maturity; and it is a news media. So I really do not see any justified reason why it should not be permitted to take its proper seat in the family circle. However, it will be under the strict supervision of the Court. I know there has been pro and con about televising in the court room. I have heard some say that it makes a circus out of the Court. I had the privilege yesterday morning of sitting in my home and viewing a sermon by the First Baptist Church over in Dallas and certainly it wasn't any circus in that church; and I feel that if it is a proper instrument in the house of the Lord, it is not out of place in the court room, if properly supervised.

"Now, television is going to be televising whatever the scene is here. If you want to watch a ball game and that is what they televise, you are going to see a ball game. If you want to see a preacher and hear a sermon, you tune in on that and that is what you are going to get. If the Court permits a circus in this court room, it will be televised, that is true, but they will not be creating a circus.

"Now, the most important point is whether or not it would interfere with a fair and impartial trial of this Defendant. That is the most important point, and that is the purpose, or will be the primary purpose of the Court, to insure that he gets that fair trial.

"There is not anything the Court can do about the interest in this case, but I can control your activities and your conduct here; and

On October 1, the trial judge issued an order delineating what coverage he would permit during the trial.[4] As a result of that order and ensuing conferences between the judge and representatives of the news media, the environment for the trial, which began on October 22, was in sharp contrast to that of the September hearings. The actual extent of television and news photography in the

---

I can assure you now that this Court is not going to be turned into a circus with TV or without it. Whatever action is necessary for the Court to take to insure that, the Court will take it.

.            .            .            .            .

"There has been one consideration that the Court has given and it is that this is a small court room and there will be hundreds of people trying to get into this court room to witness this trial. I believe we would have less confusion if they would stay at home and stay out of the court room and look in on the trial. With all of those people trying to crowd in and push into this court room, that is another consideration I have given to it."

[4] "In my statement of September 24, 1962, admitting television and other cameras in the court room during the trial of Billie Sol Estes, I said cameras would be allowed under the control and direction of the Court so long as they did not violate the legal rights of the Defendant or the State of Texas.

.            .            .            .

"In line with my statement of September 24, 1962, I am at this time informing both television and radio that live broadcasting or telecasting by either news media cannot and will not be permitted during the interrogation of jurors in testing their qualifications, or of the testimony given by the witnesses, as to do so would be in violation of Art. 644 of the Code of Criminal Procedure of Texas, which provides as follows: 'At the request of either party, the witnesses on both sides may be sworn and placed in the custody of an officer and removed out of the court room to some place where they can not hear the testimony as delivered by any other witness in the case. This is termed placing witnesses under rule.'

". . . [E]ach television network and the local television station will be allowed one film camera without sound in the court room and the film will be made available to other television stations on a pool basis. Marshall Pengra, manager of Television Station KLTV, Tyler, will be in charge of the independent pool and independent stations may

courtroom was described by the judge, after the trial had ended, in certifying the petitioner's bill of exceptions. This description is confirmed by my understanding of the entire record and was agreed to and accepted by defense counsel:

"Prior to the trial of October 22, 1962, there was a booth constructed and placed in the rear of the courtroom painted the same or near the same color as the courtroom with a small opening across the top for the use of cameras . . . .

"Live telecasting and radio broadcasting were not permitted and the only telecasting was on film without sound, and there was not any broadcasting of the trial by radio permitted. Each network, ABC, NBC, CBS and KRLD [KLTV] Television in Tyler was allowed a camera in the courtroom . . . . The telecasting on film of this case was not a continuous camera operation and only pictures being taken at intervals during the day to be used on their regular news casts later in the day. There were some days during the trial that the cameras of only one or two stations were in operation, the others not being in attendance upon the Court each and every day. The Court did not permit any cameras other than those that were noiseless nor were flood lights and flash bulbs allowed to be used in the courtroom. The Court permitted one news photographer with

---

contact him. The same will be true of cameras for the press, which will be limited to the local press, Associated Press and United Press.

. . . . .

"I am making this statement at this time in order that the two news media affected may have sufficient notice before the case is called on October 22nd.

"The rules I have set forth above concerning the use of cameras are subject to change if I find that they are too restrictive or not workable, for any reason."

Associated Press, United Press International and Tyler Morning Telegraph and Courier Times. However, they were not permitted inside the Bar; and the Court did not permit any telecasting or photographing in the hallways leading into the courtroom or on the second floor of the courthouse where the courtroom is situated, in order that the Defendant and his attorneys would not be hindered, molested or harassed in approaching or leaving the courtroom. The Court did permit live telecasting of the arguments of State's counsel and the returning of the verdict by the Jury and its acceptance by the Court. The opening argument of the District Attorney of Smith County was carried by sound and because of transmission difficulty, there was not any picture. The closing argument for the State by the District Attorney of Reeves County was carried live by both picture and sound. The arguments of attorneys for Defendant, John D. Cofer and Hume Cofer, were not telecast or broadcast as the Court granted their Motion that same not be permitted.

"There was not any televising at any time during the trial except from the booth in the rear of the courtroom, and during the argument of counsel to the jury, news photography was required to operate from the booth so that they would not interfere or detract from the attention of either the jurors or the attorneys.

"During the trial that began October 22nd, there was never at any time any radio broadcasting equipment in the courtroom. There was some equipment in a room off of the courtroom where there were periodic news reports given; and throughout the trial that began October 22nd, not any witness requested not to be televised or photographed while they were testifying. Neither did any juror, while being inter-

rogated on voir dire or at any other time, make any request of the Court not to be televised."

Thus, except for the closing arguments for the prosecution and the return of the jury's verdict, there was no "live" telecasting of the trial. And, even for purposes of delayed telecasting on later news programs, no words or other sounds were permitted to be recorded while the members of the jury were being selected or while any witness was testifying. No witnesses and no jurors were televised or photographed over their objection.[5]

Finally, the members of the jury saw no telecasts and no pictures of anything that went on during the trial. In accord with Texas law, the jurors were sequestered, day and night, from the beginning of the trial until it ended.[6] The jurors were lodged each night in quarters provided for that purpose in the courthouse itself. On the evening of November 6, by agreement of counsel and special permission of the court, the members of the jury were permitted to watch the election returns on television for a short period. For this purpose a portable television was brought into the jury's quarters by a court officer, and operated by him. Otherwise the jurors were not permitted to watch television at any time during the trial. The only newspapers permitted the jury were ones from which all coverage of the trial had been physically removed.

## II.

It is important to bear in mind the precise limits of the question before us in this case. The petition for a writ of certiorari asked us to review four separate constitutional claims. We declined to review three of them, among which was the claim that the members of the jury "had received through the news media damaging and prej-

---

[5] There were nine witnesses for the prosecution and no witnesses for the defense.

[6] Arts. 668, 745, and 725, Tex. Code Crim. Proc.

udicial evidence . . . ." [7]   We thus left undisturbed the determination of the Texas Court of Criminal Appeals that the members of the jury were *not* prejudiced by the widespread publicity which preceded the petitioner's trial. One ingredient of this pretrial publicity was the telecast of the September hearings.   Despite the confusion in the courtroom during those hearings, all that a potential juror could have possibly learned from watching them on television was that the petitioner's case had been called for trial, and that motions had been made and acted upon for a continuance, and to exclude cameras and television. At those hearings, there was no discussion whatever of anything bearing on the petitioner's guilt or innocence. This was conceded by the petitioner's counsel at the trial.[8]

Because of our refusal to review the petitioner's claim that pretrial publicity had a prejudicial effect upon the jurors in this case, and because, insofar as the September hearings were an element of that publicity, the claim is patently without merit, that issue is simply not here. Our decision in *Rideau* v. *Louisiana*, 373 U. S. 723, therefore, has no bearing at all in this case.   There the record showed that the inhabitants of the small Louisiana parish where the trial was held had repeatedly been exposed to a television film showing "Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff."   373 U. S.,

---

[7] Petition for Writ of Certiorari, Question 3, p. 3.

[8] "A. [Mr. Hume Cofer, counsel for petitioner] . . . . The publicity that was given this trial on the last occasion and the number of cameras here, I think was sufficient to spread the news of this case throughout the county, to every available juror; and it is my opinion that on that occasion, there were so many cameras and so much paraphernalia here that it gave an opportunity for every prospective juror in Smith County to know about this case.

"Q. Not about the facts of the case?

"A. No, sir; not about the facts, nor any of the evidence."

at 725. We found that "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.,* at 726. See also *Irvin* v. *Dowd,* 366 U. S. 717.

The *Rideau* case was no more than a contemporary application of enduring principles of procedural due process, principles reflected in such earlier cases as *Moore* v. *Dempsey,* 261 U. S. 86; *Brown* v. *Mississippi,* 297 U. S. 278; and *Chambers* v. *Florida,* 309 U. S. 227, 235–241. "Under our Constitution's guarantee of due process," we said, "a person accused of committing a crime is vouchsafed basic minimal rights. Among these are the right to counsel, the right to plead not guilty, and the right to be tried in a courtroom presided over by a judge." 373 U. S., at 726–727. We had occasion to apply the same basic concepts of procedural due process earlier this Term in *Turner* v. *Louisiana,* 379 U. S. 466. "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." 379 U. S., at 472–473.

But we do not deal here with mob domination of a courtroom, with a kangaroo trial, with a prejudiced judge or a jury inflamed with bias. Under the limited grant of certiorari in this case, the sole question before us is an entirely different one. It concerns only the regulated presence of television and still photography at the trial itself, which began on October 22, 1962. Any discussion of pretrial events can do no more than obscure the important question which is actually before us.

### III.

It is obvious that the introduction of television and news cameras into a criminal trial invites many serious constitutional hazards. The very presence of photog-

raphers and television cameramen plying their trade in a courtroom might be so completely and thoroughly disruptive and distracting as to make a fair trial impossible. Thus, if the scene at the September hearing had been repeated in the courtroom during this jury trial, it is difficult to conceive how a fair trial in the constitutional sense could have been afforded the defendant.[9] And even if, as was true here, the television cameras are so controlled and concealed as to be hardly perceptible in the courtroom itself, there are risks of constitutional dimensions that lurk in the very process of televising court proceedings at all.

Some of those risks are catalogued in the *amicus curiae* brief filed in this case by the American Bar Association: "[P]otential or actual jurors, in the absence of enforceable and effective safeguards, may arrive at certain misconceptions regarding the defendant and his trial by viewing televised pre-trial hearings and motions from which the jury is ordinarily excluded. Evidence otherwise inadmissible may leave an indelible mark. . . . Once the trial begins, exposure to nightly rebroadcasts of selected portions of the day's proceedings will be difficult to guard against, as jurors spend frequent evenings before the television set. The obvious impact of witnessing repeated trial episodes and hearing accompanying commentary, episodes admittedly chosen for their news value and not for evidentiary purposes, can serve only to distort the jurors' perspective. . . . Despite the court's injunction not to discuss the case, it seems undeniable that jurors will be subject to the pressure of television-watching family, friends and, indeed, strangers. . . . It is not too much to imagine a juror being confronted with his wife's television-oriented viewpoint. . . . Additionally, the jurors' daily television appearances may make them recognizable celebrities, likely to be stopped by passing

---

[9] See note 2.

strangers, or perhaps harried by intruding telephone calls. . . ." Constitutional problems of another kind might arise if a witness or juror were subjected to being televised over his objection.

The plain fact of the matter, however, is that none of these things happened or could have happened in this case. The jurors themselves were prevented from seeing any telecasts of the trial, and completely insulated from association with any members of the public who did see such telecasts. This case, therefore, does not remotely resemble *Turner* v. *Louisiana*, 379 U. S. 466, where, during the trial, the jurors were subjected outside the courtroom to unmeasured and unmeasurable influences by key witnesses for the prosecution.

In the courtroom itself, there is nothing to show that the trial proceeded in any way other than it would have proceeded if cameras and television had not been present. In appearance, the courtroom was practically unaltered. There was no obtrusiveness and no distraction, no noise and no special lighting. There is no indication anywhere in the record of any disturbance whatever of the judicial proceedings. There is no claim that the conduct of the judge, or that any deed or word of counsel, or of any witness, or of any juror, was influenced in any way by the presence of photographers or by television.

Furthermore, from a reading of the record it is crystal clear that this was not a trial where the judge was harassed or confused or lacking in command of the proceedings before the jury. Not once, after the first witness was called, was there any interruption at all of the trial proper to secure a ruling concerning the presence of cameramen in the courtroom. There was no occasion, during the entire trial—until after the jury adjourned to reach its verdict—for any cautionary word to members of the press in the courtroom. The only time a motion was made, the jury was not in the courtroom. The trial itself was a

most mundane affair, totally lacking in the lurid and completely emotionless. The evidence related solely to the circumstances in which various documents had been signed and negotiated. It was highly technical, if not downright dull. The petitioner called no witnesses, and counsel for petitioner made only a brief closing argument to the jury. There is nothing to indicate that the issues involved were of the kind where emotion could hold sway. The transcript of the trial belies any notion that frequent interruptions and inconsistent rulings communicated to the jury any sense that the judge was unable to concentrate on protecting the defendant and conducting the trial in a fair manner, in accordance with the State and Federal Constitutions.

## IV.

What ultimately emerges from this record, therefore, is one bald question—whether the Fourteenth Amendment of the United States Constitution prohibits all television cameras from a state courtroom whenever a criminal trial is in progress. In the light of this record and what we now know about the impact of television on a criminal trial, I can find no such prohibition in the Fourteenth Amendment or in any other provision of the Constitution. If what occurred did not deprive the petitioner of his constitutional right to a fair trial, then the fact that the public could view the proceeding on television has no constitutional significance. The Constitution does not make us arbiters of the image that a televised state criminal trial projects to the public.

While no First Amendment claim is made in this case, there are intimations in the opinions filed by my Brethren in the majority which strike me as disturbingly alien to the First and Fourteenth Amendments' guarantees against federal or state interference with the free communication of information and ideas. The suggestion that there are limits upon the public's right to know what goes on in

the courts causes me deep concern. The idea of imposing upon any medium of communications the burden of justifying its presence is contrary to where I had always thought the presumption must lie in the area of First Amendment freedoms. See *Speiser* v. *Randall,* 357 U. S. 513, 525. And the proposition that nonparticipants in a trial might get the "wrong impression" from unfettered reporting and commentary contains an invitation to censorship which I cannot accept. Where there is no disruption of the "essential requirement of the fair and orderly administration of justice," "[f]reedom of discussion should be given the widest range." *Pennekamp* v. *Florida,* 328 U. S. 331, 347; *Bridges* v. *California,* 314 U. S. 252. Cf. *Cox* v. *Louisiana,* 379 U. S. 559, 563.

I do not think that the Constitution denies to the State or to individual trial judges all discretion to conduct criminal trials with television cameras present, no matter how unobtrusive the cameras may be. I cannot say at this time that it is impossible to have a constitutional trial whenever any part of the proceedings is televised or recorded on television film. I cannot now hold that the Constitution absolutely bars television cameras from every criminal courtroom, even if they have no impact upon the jury, no effect upon any witness, and no influence upon the conduct of the judge.

For these reasons I would affirm the judgment.

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN joins, dissenting.

I agree with MR. JUSTICE STEWART that a finding of constitutional prejudice on this record entails erecting a flat ban on the use of cameras in the courtroom and believe that it is premature to promulgate such a broad constitutional principle at the present time. This is the first case in this Court dealing with the subject of television

coverage of criminal trials; our cases dealing with analogous subjects are not really controlling, cf. *Rideau* v. *Louisiana,* 373 U. S. 723; and there is, on the whole, a very limited amount of experience in this country with television coverage of trials. In my view, the currently available materials assessing the effect of cameras in the courtroom are too sparse and fragmentary to constitute the basis for a constitutional judgment permanently barring any and all forms of television coverage. As was said in another context, "we know too little of the actual impact . . . to reach a conclusion on the bare bones of the . . . evidence before us." *White Motor Co.* v. *United States,* 372 U. S. 253, 261. It may well be, however, that as further experience and informed judgment do become available, the use of cameras in the courtroom, as in this trial, will prove to pose such a serious hazard to a defendant's rights that a violation of the Fourteenth Amendment will be found without a showing on the record of specific demonstrable prejudice to the defendant. Compare *Wolf* v. *Colorado,* 338 U. S. 25, with *Mapp* v. *Ohio,* 367 U. S. 643; *Betts* v. *Brady,* 316 U. S. 455, with *Gideon* v. *Wainwright,* 372 U. S. 335; *Stein* v. *New York,* 346 U. S. 156, with *Jackson* v. *Denno,* 378 U. S. 368, 389–390.

The opinion of the Court in effect precludes further opportunity for intelligent assessment of the probable hazards imposed by the use of cameras at criminal trials. Serious threats to constitutional rights in some instances justify a prophylactic rule dispensing with the necessity of showing specific prejudice in a particular case. *Rideau* v. *Louisiana,* 373 U. S. 723, 727; *Jackson* v. *Denno,* 378 U. S. 368, 389. But these are instances in which there has been ample experience on which to base an informed judgment. Here, although our experience is inadequate and our judgment correspondingly infirm, the Court discourages further meaningful study of the use of television at criminal trials. Accordingly, I dissent.

Mr. Justice Brennan.

I write merely to emphasize that only four of the five Justices voting to reverse rest on the proposition that televised criminal trials are constitutionally infirm, whatever the circumstances. Although the opinion announced by my Brother Clark purports to be an "opinion of the Court," my Brother Harlan subscribes to a significantly less sweeping proposition. He states:

> "The Estes trial was a heavily publicized and highly sensational affair. I therefore put aside all other types of cases . . . . The resolution of those further questions should await an appropriate case; the Court should proceed only step by step in this unplowed field. *The opinion of the Court necessarily goes no farther, for only the four members of the majority who unreservedly join the Court's opinion would resolve those questions now.*" *Ante,* pp. 590–591. (Emphasis supplied.)

Thus today's decision is *not* a blanket constitutional prohibition against the televising of state criminal trials.

While I join the dissents of my Brothers Stewart and White, I do so on the understanding that their use of the expressions "the Court's opinion" or "the opinion of the Court" refers only to those views of our four Brethren which my Brother Harlan explicitly states he shares.