**D. E. JACKSON, Appellant,**

v.

**Harry MOORE, Trustee in Bankruptcy of Billie Sol Estes, Bankrupt, Appellee.**

**No. 21854.**

United States Court of Appeals Fifth Circuit.

July 14, 1965.

J. B. Trimble, Trimble & Dobbs, Corpus Christi, Tex., for appellant.

Allan L. Poage, El Paso, Tex., for appellee.

Thad Grundy, Houston, Tex., for amicus curiæ, Commercial Solvents Corp.

Before TUTTLE, Chief Judge, and BROWN and FRIENDLY,* Circuit Judges.

JOHN R. BROWN, Circuit Judge:

The basic question in this appeal is whether the Bankruptcy Court had jurisdiction to restrain a real estate broker from pursuing a state court action against one who had acquired property from the bankrupt estate seeking recovery of a real estate commission for selling such property. We answer yes, but—and affirm with instructions because our decision on the basic issue raises further problems on the nature and scope of relief to be accorded.

The property in question, 13,215 acres of land in West Texas once part of the Billie Sol Estes empire,[1] was transferred

---

* Of the Second Circuit, sitting by designation.

1. For a part of the story see, Estes v. United States, 5 Cir., 1964, 335 F.2d 609,

by the Trustee to American Grain[2] on October 2, 1962, pursuant to a contract of September 5, 1962, which was approved by the Bankruptcy Court on September 29, 1962. This was no ordinary sale of a bankrupt's property in which the property was transferred and the consideration received for distribution to creditors. For our purposes, we may piece the story together briefly. The creditors and the Trustee concluded that the best way to achieve maximum recovery from these far-flung properties, many of which were subject to liens of various priority, was to transfer them to a purchaser for a lump sum but on liberal credit terms with the expectation that the purchaser would liquidate the properties. The liquidation would thereby pay the purchase price and supply simultaneously funds for distribution to creditors.[3] This plan was effected by the complex contract of sale with American Grain, a corporation created specifically for this purpose, with limited, but significant warranty guarantees by its moving figure, Morris D. Jaffe. The purchase price was $5,800,000 plus interest of $1,200,000 aggregating $7 million. The entire purchase price was represented by a non-interest bearing promissory note. To secure the purchase money debt American Grain was to, and did, execute appropriate mortgage deeds of trust subject only to existing valid liens. Payments on the purchase price were to come primarily from proceeds of sales when and as made to third parties.[4]

As is evident, protection of creditors required specific, stringent restrictions on the internal operations of American Grain, the resale of any properties, the amount and disposition of the sales price. Thus, the contract expressly provided that before this property could be disposed of by American Grain, it had to obtain the Trustee's prior written approval of "the price and terms of such sale." Details of any resale were also controlled. And as to real estate commissions it was provided that "From the gross proceeds of a sale [by American Grain] there shall be deducted (1) the reasonable costs and expenses of such sales * * *." (See note 4, supra) This is of crucial importance here. With the properties in effect being the primary, if not sole, source for payment of the initial contract price, the bankruptcy estate was imperiled to the extent of any deduction permitted from the gross proceeds of any resale by American Grain.

In September 1963, American Grain made what was apparently a "net price" letter agreement[5] with the real estate broker Jackson for sale of the property. Jackson was to procure a buyer; American Grain was to receive $2,000,000 net, with the excess of the purchase price going to Jackson as commission, provided that in no event would his commission exceed 10% of the sales price. Jackson was quite successful and made a deal with Ceres Ranches for a purchase price of $2,225,000, 10% of which would be $222,-500 as commission to Jackson under the agreement.[6]

cert. denied, 1965, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559, and Estes v. Texas, 1965, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 [No. 256, O.T.1964, June 7, 1965, 33 L.W. 4543], reversing, 1964, Tex.Crim.

2. American Grain Company.

3. On argument informal estimates indicated creditors' claims in the neighborhood of 20 to 30 million and realizable assets of 8 to 10 million.

4. Under the formulae, broadly phrased, gross proceeds after deducting "(1) the reasonable costs and expenses of such sales," (2) valid liens and (3) certain ad-

vances were to be applied 50% on the note, 50% to holders of specified liens on grain storage warehouses. Payment was also due each quarter of a sum representing the net operating revenues after deducting specified charges.

5. American Grain to Jackson, November 1, 1963: " * * * for quick sale I offer them to you, all the above [properties], at $2,000,000 net to us. * * * In any case, however, we would have to limit your commission to 10% and if by chance you get more than this through a sale the balance will belong to us."

6. It is well to emphasize that as it turns out Jackson's asserted right to commis-

American Grain, after formulating the contract with Ceres Ranches, filed in the Bankruptcy Court a petition seeking an order authorizing the Trustee to approve the sale. By summary proceeding, a hearing was held on December 23, 1963, at which all interested parties took part. Jackson was not cited as an interested party, but he was voluntarily present. Jackson was not accompanied by his attorneys, but had consulted with them prior to attending, and both informally, and formally as a witness, expressed himself fully at the hearing primarily as a consequence of the Referee's expressed concern over the amount and reasonableness of the percentage commission. He took the rather obvious position that he felt he had a firm deal with American Grain and was entitled to the full amount under the listing contract formula—a deal being a deal. The Referee thought 10% was too much, and after informal efforts toward reducing it to 5% failed, the Referee by the order of December 26, 1963, proceeded to approve the contract leaving open the question of the amount of commission to be paid Jackson. This was to be decided by the Referee at a later date with ample notice to Jackson. If this was unsatisfactory to bystander, sometime witness Jackson, the record fails to show it.

But on January 21, 1964, Jackson brought his state court action against American Grain for recovery of the full commission due him under the letter agreement. Ten days later, the Trustee filed in the Bankruptcy Court his application for an order restraining Jackson from prosecuting his state court suit. At the show cause hearing on February 10, 1964, Jackson appeared specially to contest the Bankruptcy Court's jurisdiction. On the same day the Referee entered an order by which Jackson was "restrained and enjoined from taking any further action regarding the commission allegedly due * * * Jackson by American Grain * * *."

A petition for review, filed March 6, 1964, was unavailing and by order of June 18, 1964, the District Court affirmed the Referee's restraining order. From that Jackson has appealed here, asserting primarily that the Bankruptcy Court lacked jurisdiction to enter this order.

We hold that the Bankruptcy Court has jurisdiction (1) to determine what amount should be allowed Jackson as commission with regard to both claims[7] and (2) to enjoin Jackson from prosecuting the state court action.

Slipping into the familiar challenge to summary jurisdiction, Jackson asserts that the Bankruptcy Court had no power since the underlying subject of the State Court suit—the land—was not in the custody of the Bankruptcy Court. Going further, he emphasizes that the State Court dispute was the meaning, validity and application of a run-of-the-mill Texas contract for a commission for the sale of real estate, made between two parties who were free to contract concerning property then owned by one of them, and neither undertaking to act for, or bind the bankruptcy estate in any way.

Our problem is not of custody but of contracts made with the bankruptcy estate through the Bankruptcy Court When American Grain agreed to purchase this enormous array of encumbered assets, it was contracting with the Court, In re California Eastern Airways, D.Del., 1951, 95 F.Supp. 348, 351. The Court had summary jurisdiction to dispose of any controversies affecting the bankrupt estate arising out of the terms of the contract with the Trustee. And this jurisdiction could not be displaced or undercut by the process of any other court. See the review of these principles in In re American Fidelity Corp., S.D.Cal., 1939, 28 F.Supp. 462; 2 Collier, Bank-

sion contains two claims. Claim (1): a "reasonable" amount out of the proceeds of the sale of the Bankrupt's property by virtue of the contract between the Trustee and American Grain; and Claim (2):

a fixed amount by virtue of the separate agreement between him and American Grain.

7. See note 6, supra.

ruptcy § 23.04[2]; Governor Clinton Co. v. Knott, 2 Cir., 1941, 120 F.2d 149.

Of course, the terms of this unusual contract graphically demonstrate the wisdom of this rule. If—and the if was or still might be a big one—all went well, the estate stood to obtain 7 million dollars for distribution to various creditors, preferred and general. But there was no corporate "personal" liability on American Grain for payment of this "purchase" price. All, save the initial down payment, was to come out of the proceeds of the resale of the properties plus net operating revenues, if any, from American Grain operations. The bankrupt estate had, and will have, a direct and continuous interest in these properties or their proceeds until the full price is paid.

 Even more direct, the contract prescribed what was to be done with the proceeds on resale and the precise formulae for allocation. One item to be first deducted was the reasonable cost and expense of such sale. Since, for all practical purpose, American Grain's ultimate obligation was to pay for the properties out of net resale proceeds, the deduction of sales cost was, or might well turn out to be, in effect an expenditure by the bankrupt estate itself. Consequently, some tribunal had to have the power to determine matters arising out of the performance of the contract which had such an immediate bearing on the affairs of the estate. In such situations the law has long recognized that the Bankruptcy Court has summary jurisdiction of such controversies where expressly or by necessary implication an interest in the property or its disposition is retained. Wabash R. v. Adelbert College, 1908, 208 U.S. 38, 28 S.Ct. 182, 52 L.Ed. 379; St. Louis-San Francisco R.R. v. Byrnes, 8 Cir., 1928, 24 F.2d 66.

The result is that we affirm the determination that the Bankruptcy Court had summary jurisdiction to grant the injunction. That leaves, though, the problem of the scope and nature of the order. As the likelihood of our affirming the jurisdictional point was so imminent to us, we invited extended comments of counsel during oral argument.

It occurred to us that perhaps the relief did not have to be as sweeping as the broad order entered. Indeed, since the letter contract seemed to be so plain in its terms, it appeared to us that after consultation with American Grain, the parties could effect an arrangement which, although in no sense a compromise settlement, would accomplish the following. First, there would be an immediate determination by the Bankruptcy Court of that portion of the commission which would be deductible as a reasonable expense of the sale. Second, the agreement would provide for the payment of any difference between that figure and the contract 10% in a way to assure that security of the bankruptcy estate was not imperiled. And third, failing agreement as to the second, an agreed order would be jointly approved by Trustee, Jackson, and American Grain which would distinctly provide for the severance of the two claims and the partial relinquishment of the non-bankruptcy contract claim to the State Court under suitable reservations as to execution on or satisfaction of such judgment.

Despite what we are convinced were genuine, co-operative efforts of all counsel, aided greatly by the amicus, no such agreement could be reached. Failing this, various proposed orders were submitted, but each seemed to contain the seeds for more controversy than that being solved. Worse, it was to increase, not decrease, the chance of collision of State and Federal Courts. Reports of counsel indicate that American Grain is apparently taking the position that it has no corporate personal liability beyond the amounts retained by it, or permissibly deducted from proceeds of resales.

 Under these circumstances, we have reached the conclusion that the whole controversy between Jackson and American Grain, the Trustee or both, for this commission ought to be determined exclusively in the Bankruptcy Court. This means that Jackson is to be allowed to present an appropriate petition for re-

lief against the Trustee, American Grain, or both.

The Bankruptcy Court will therefore have two matters for hearing and determination. The first—probably a pure Federal bankruptcy problem—is the amount (and method of payment) to be allowed under paragraph 7 of the contract as a deduction for the "reasonable costs and expenses" of the sale. No hearing has yet been held on this although the order of December 26, 1963, reflects that one was to be held.

The second concerns the liability of American Grain for the difference, if any, between the amount allowed as a "reasonable expense of the sale" and that due under the letter contract. Obviously it is more complex since there are inextricably intertwined bankruptcy and Texas contract factors. Stated differently, some of the issues might be: (a) What is the "contract" between Jackson and American Grain?; (b) To what extent, if any, was the agreement either factually or legally modified or subject to construction by the fact that the commission pertained to the sale of property still under the effective control of the Bankruptcy Court?; (c) Is there any limitation or restriction as to the funds, property or source of funds or property out of which the commission is payable?; (d) What restrictions, if any, are appropriate in any decree fixing rights against American Grain to assure that the ultimate interest of the bankruptcy estate is not imperiled or reduced, and upon resort to such restrictions is there any reason why the amount allowed for commission is to be affected by the bankruptcy origin of the property?

■ Obviously we express no opinion on the outcome of these or other bank-

ruptcy-Texas, bankruptcy or Texas questions. We do hold, however, that Jackson was charged both as a matter of fact and law with knowledge that this property was subject to control of the Bankruptcy Court.[8] And whatever the decision reached on this phase, the Bankruptcy Court must make certain that the ultimate interest of the bankruptcy estate under the basic American Grain contract is not reduced or jeopardized by payments made by, or exacted from, American Grain on the judgment therefor.

Affirmed and remanded.

---

8. Jackson's proposal letter, October 30, 1963, to the buyers stated:

"5. The American Grain Corporation in accordance with contractual arrangements with Barry Moore, Trustee Estate of Billie Sol Estes, desires to liquidate the property on or before October 2, 1972. It is therefore unlikely that terms exceeding the date above named

will be available from The American Grain Corporation."

The Trustee's deed into American Grain of October 2, 1962, referred expressly to the Court's orders of September 29 and October 2, 1962, confirming sale to American Grain on the conditions previously discussed. The deed was duly recorded.